**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Ricardo MURILLO, Defendant–**
**Appellant.**

**No. 00–10163.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 15, 2002.

Filed April 25, 2002.

---

John C. Lambrose, Assistant Federal Public Defender, Las Vegas, Nevada, for the defendant-appellant.

Peter Ko and Thomas M. O'Connell, Assistant United States Attorneys, Las Vegas, Nevada, for the plaintiff-appellee.

Before: GOODWIN and TROTT, Circuit Judges, and EZRA,* District Judge.

GOODWIN, Circuit Judge.

Ricardo Murillo appeals his conviction and life sentence for participation with three other persons in the murder-for-hire of Patricia Margello. The district court's jurisdiction was grounded upon 18 U.S.C. § 1958(a), which prohibits the use of interstate commerce facilities in the commission of murder-for-hire. After a seven-day tri-

al, Murillo was convicted of both the conspiracy count and the participation count. The appeal challenges the thirteen-month delay between indictment and trial, and an alleged "Batson" error in excusing a juror at the request of the prosecution. Other alleged errors were briefed and argued. None requires reversal.

## FACTUAL BACKGROUND

In summer 1998, Christopher Moseley, a Delaware resident, sent his troubled stepson Dean MacGuigan, a forty-year old unemployed drug addict, to Las Vegas to establish residency and obtain a quick divorce. Moseley hired Diana Hironaga, Joseph Balignasa, and Murillo to help MacGuigan "straighten out his life." Moseley directed activities from Delaware. The three hired hands were to help MacGuigan find a job and obtain a divorce attorney. "Operation Dean," as it was called, however, soon escalated to its darker side, the murder of Margello, whom Moseley considered a bad influence on MacGuigan.

During the evening of August 1 through the early morning of August 2, 1998, Hironaga lured Margello to a meeting with Murillo and Balignasa. The four drove to a motel in Las Vegas, where Hironaga booked a room for them under her name. Once in the room, Margello made three telephone calls. The third call was to MacGuigan; Margello told him that she was with Hironaga and Murillo and had a "bad feeling." After Margello hung up the phone, Murillo pushed her to the bed, and with Balignasa holding Margello's feet and Hironaga her arms, strangled her to death with a belt.

* The Honorable David A. Ezra, United States District Judge for the District of Hawaii, sitting by designation.

After Margello was dead, Murillo and Balignasa went to a nearby convenience store to buy trash bags and mailing tape. Hironaga stayed in the hotel room with the corpse. When Murillo and Balignasa returned with the supplies, the three wrapped the body in trash bags and a sheet from the bed. They secured the bags around the body with tape, a cable from the television set and jumper cables from Murillo's car. They then stuffed the body into the air conditioning duct of the motel room. Balignasa and Hironaga used towels to wipe away evidence. Balignasa then placed the soiled towels in a black bag, which Murillo put in the trunk of his car.

Moseley, still in Delaware, made flight reservations for Murillo and Hironaga to travel to Philadelphia to collect payment. When Murillo and Hironaga arrived at the Philadelphia airport, they were met by a limousine driver who delivered the cash from Moseley. According to Hironaga, she received $5000 and Murillo received $10,000.

Margello's body was discovered on August 4, 1998. On August 28, Hironaga was questioned by police. She admitted participating in Margello's murder and incriminated Moseley, Murillo and Balignasa. Murillo was questioned on September 1. He denied participating in Margello's murder, but made several statements that the police knew were false. That same day, investigators discovered a white Ford Tempo outside of Murillo's apartment. The car was registered to Murillo and his girlfriend. The Tempo was seized and a warrant was obtained for a search which produced two hotel towels that matched those in the motel where the body was found.

After his interview, Murillo was arrested on murder charges. Moseley was interviewed and confessed to paying Hironaga and Murillo to kill Margello. On September 22, a federal grand jury indicted Murillo, Hironaga and Moseley on the conspiracy and murder-for-hire charges, and on October 9, the three co-defendants were arraigned. A tentative trial date was set for November 30, 1998. (Balignasa was prosecuted by the State of Nevada, and was not tried with the co-defendants.)

Over Murillo's objection, the court in November 1998 granted the government an "ends of justice" continuance pursuant to 18 U.S.C. § 3161(h)(8)(A) and re-scheduled the trial to begin in October 1999. Murillo's request that his trial be severed from that of his co-defendants was granted in January 1999, but his trial date was not advanced. After further negotiations, Hironaga and Moseley entered into plea agreements. On November 8, 1999, Murillo's trial began. Murillo was convicted by a jury of the murder-for-hire charges and sentenced to concurrent life terms.

## DISCUSSION

### I. The Speedy Trial Issues

Moseley and Hironaga agreed to the government's motion for the "ends of justice" continuance, but Murillo consistently opposed the continuance, stating that he was "ready to proceed to trial." At the November 25, 1998 calendar call, Judge Pro, who was then presiding over the early stages of the prosecution, held a hearing on the Motion to Continue, at which time Murillo stated that "we're ready ... for trial on Monday." Murillo argued that this was "not a complicated case," as there were "few witnesses," "no forensic evidence" and "neither wiretaps, nor extensive discovery."

On December 1, 1998, the district court issued an order granting the continuance until October 1999 "in accordance with 18 U.S.C. § 3161(h)(8)(A), as the ends of justice served by taking such action outweigh

the interests of the public and the Defendants in a speedy trial." Because the statute under which the prosecution was proceeding authorized the death penalty, and because the local United States Attorney was required to clear death penalty issues with the United States Department of Justice ("DOJ") before setting in motion the procedures required for a capital case,[1] it was obvious that the trial could not commence "on Monday."

In April 1999, the government gave notice of its intent not to seek the death penalty. In May, Hironaga entered into a plea agreement, and agreed to testify against Moseley and Murillo. On June 11, 1999, Murillo abandoned his earlier argument that the case was not complicated, and joined the government in a stipulation to continue deadline dates for motions. The stipulation stated, in part, "Denial of this request for continuance would deny counsel for the defendant sufficient time, in light of the extensive nature of the discovery, and the fact that the investigation in this case involves several geographical locations, within which to be able to effectively and thoroughly research, prepare and submit for filing appropriate pretrial motions and notices of defense."

On July 1, 1999, Murillo filed a motion to suppress the towels found in the trunk of his car. Murillo also filed a Motion to Dismiss under the Speedy Trial Act, 18 U.S.C. § 3161 *et seq.* On August 6, 1999, the Magistrate Judge issued a report in which he recommended that the court deny Murillo's motion to suppress physical evidence. On August 23, 1999, the government filed its brief in opposition to Murillo's Motion to Dismiss under the Speedy Trial Act. Four days later, the Magistrate Judge issued a Report and Recommendation to Deny Murillo's Motion to Dismiss under the Speedy Trial Act. On August 30,

1999, the district court issued an Order affirming the Magistrate Judge's Reports and Recommendations Denying Murillo's Motion to Suppress Physical Evidence. On September 22, 1999, the district court issued an Order denying Murillo's Motion to Dismiss under the Speedy Trial Act. Finally, on November 8, 1999, Murillo's trial began.

The above described sequence of motions, deliberations and rulings is unremarkable in a complex federal prosecution, particularly one in which the Justice Department had been required to give consideration to the death penalty. There is no evidence, circumstantial or direct, that the government sought any tactical advantage by delay. Obviously, the government was aware of the tactical advantage of having two out of three defendants agree to a plea, and to testify. The record, however, contains no suggestion that the government delayed its negotiations with the conspirators in order to deny Murillo a speedy trial.

## A. Sixth Amendment

Murillo's appeal argues his speedy trial violation on two theories: (1) Sixth Amendment right, and (2) statutory right, 18 U.S.C. § 3161. Murillo claims that the Speedy Trial Act is merely a narrower codification of the constitutional speedy trial right under the sixth amendment, citing *United States v. Pollock* 726 F.2d 1456, 1459–60 (9th Cir.1984). *Pollock* states: "The specific time limits set by the Speedy Trial Act are, of course, different from the broader limits of the sixth amendment or the due process clause of the fifth amendment. The application of those constitutional provisions is governed by the more flexible consideration of prejudice caused by delay." *Id.* at 1460 n. 5. We need not,

---

1. United States Department of Justice, United States Attorneys' Manual, Criminal Division,

9–10.020 Authorization and Consultation Prior to Seeking the Death Penalty.

in this appeal, be detained by how the matter was raised in the trial court, or by the theoretical question whether Murillo's right is statutory or constitutional. It is both. The real question is whether the government illegally deprived him of the right to a speedy trial, and if so, whether the delay was prejudicial.

■ To determine whether a defendant's constitutional right to a speedy trial has been violated, a court must first determine whether the delay was "presumptively prejudicial." *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). Only if this threshold is met need the court engage in the complete *Barker* balancing test. That test analyzes four factors: "whether delay before trial was uncommonly long, whether the government or the criminal defendant is more to blame for that delay, whether, in due course, the defendant asserted his right to a speedy trial, and whether he suffered prejudice as the delay's result." *Doggett v. United States*, 505 U.S. 647, 651, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992) (citing *Barker*, 407 U.S. at 530, 92 S.Ct. 2182).

The length of delay between arrest and trial in this case was about thirteen months. Murillo begins counting from his arraignment on October 9, 1998. In the early stages of the prosecution, he was seeking a speedy trial, but, as the pretrial investigation and motion practice proceeded, he changed his mind and joined the government in asking for more time to prepare.

■ A delay of thirteen months between arrest and trial is "presumptively prejudicial" and triggers a *Barker* inquiry. *See, e.g. United States v. Lam*, 251 F.3d 852, 856 (9th Cir.2001), *amended by* 262 F.3d 1033 (9th Cir.2001) ("readily apparent" that fourteen-and-a-half month delay "exceeded the threshold minimum beyond which we presume prejudice to the defendant."). The first prong of the *Barker*

balancing test is "the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination." *Doggett*, 505 U.S. at 652, 112 S.Ct. 2686. As in *Lam*, the length of the delay in this case only "militates slightly" in the defendant's favor. *Lam*, 251 F.3d at 857. The second prong is an examination of the reason for the delay. The district court did not err when it found the continuance was proper to complete the death penalty evaluation process and to allow for additional preparation time, given the complexity of the case. Again, *Lam* is controlling. Like the present appeal, *Lam* involved an appeal in a complex murder case in which the death penalty was a consideration, and much, but not all, of the delay was produced by the court-appointed defense counsel, who vigorously filed motions and pursued the kind of investigations to be expected in such a case. Indeed, in a capital murder case, a defense counsel who lets a case speed to trial without such motions and investigations would invite post-conviction relief for failing to provide an adequate defense.

■ The third *Barker* factor is the defendant's assertion of his right to a speedy trial; this assertion "must be viewed in light of [defendant's] other conduct." *United States v. Loud Hawk*, 474 U.S. 302, 314, 106 S.Ct. 648, 88 L.Ed.2d 640 (1986). Although Murillo did assert his right to a speedy trial, Murillo also joined the government in a stipulation to continue deadline dates for motions, noting the complexity of the case and the extensive discovery involved. Finally, the fourth *Barker* factor is prejudice to the defendant. Murillo cites *United States. v. Hall*, 181 F.3d 1057, 1062 (9th Cir.1999), for the proposition that prejudice results when a defendant is "carr[ied] along" in continuances whose underlying goal is to achieve a plea agreement between his co-defendant and the

government. *Hall* is distinguishable, as Murillo's motion to sever was granted ten months before trial and he was not impermissibly "carried along" in his co-defendants' continuances. The delay in this case did not prejudice Murillo. A weighing of the *Barker* factors shows that Murillo's constitutional right to a speedy trial was not violated.

### B. *Speedy Trial Act*

Under the Speedy Trial Act (STA), a defendant must be brought to trial within seventy days of the indictment or his initial appearance before a judicial officer, whichever is later. 18 U.S.C. § 3161(c)(1). The statute, however, provides exceptions to the seventy-day limit, periods of "excludable delay." The district court in this case relied on the "ends of justice" exception in granting the government's request for a continuance. *See* 18 U.S.C. § 3161(h)(8)(A).

Murillo argues that the district court committed legal error in basing the continuance on this "ends of justice" exception. First, he denies that the DOJ needed additional time to complete the death penalty evaluation. Next, he argues that his speedy trial rights were subjugated to the interests of his codefendants, who wanted to delay the trial. Finally, he terms as "conclusory" the court's findings that the case was unusual and required additional preparation time.

 A district court's finding of an "ends of justice" exception will be reversed only if there is clear error. *United States v. Ramirez–Cortez,* 213 F.3d 1149, 1153 (9th Cir.2000). Murillo's first argument—denying that the government needed time for death penalty evaluation—finds no support in case law. In fact, the only case cited by the parties on this issue held that the government's need for additional time to seek the death penalty was a valid reason for an "ends of justice" continu-

ance. *See United States v. Mathis,* 96 F.3d 1577, 1581 (11th Cir.1996), *cert. denied,* 520 U.S. 1213, 117 S.Ct. 1699, 137 L.Ed.2d 825 (1997). Moreover, there is no language in the STA that prevents a judge from considering the need for additional time to complete the death penalty evaluation process when granting an "ends of justice" continuance. The Supreme Court has rejected previous attempts to read additional requirements into the language of § 3161(h). *See, e.g., Henderson v. United States,* 476 U.S. 321, 330, 106 S.Ct. 1871, 90 L.Ed.2d 299 (1986) (rejecting the notion that only "reasonably necessary" delays are excludable under § 3161(h)(1)(f)). We join our sister circuit in holding that the death penalty consideration process is a valid reason to grant an ends of justice continuance.

On April 14, 1999, the government gave notice of its intent not to seek the death penalty. Therefore, the 77 day period between April 14 and July 1, 1999 (the date that Murillo filed a Motion to Suppress Evidence, which tolled the STA clock) must be justified by some reason other than death penalty considerations. The other reasons for the continuance (namely the complexity of the case) continued to be valid after April 14. Notwithstanding Murillo's argument that the case was not complex, his own stipulation that it was complex renders this point virtually frivolous.

Murillo's second argument—that in granting the continuance, the district court impermissibly subjugated his rights to the interests of his codefendants—is equally meritless. Although Hironaga and Moseley joined in the request for a continuance, the district court did not delay Murillo's trial for the benefit of his co-defendants. (Murillo was still joined for trial with his co-defendants at that point; his motion to sever was not granted until later.) Nothing in the record supports the claim that

Murillo's STA rights were sacrificed to protect the interests of Hironaga and Moseley.

Finally, the STA states in relevant part: No ... period of delay resulting from a[n "ends of justice"] continuance ... shall be excludable ... unless the court sets forth, in the record of the case, either orally or in writing, its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial.

18 U.S.C. § 3161(h)(8)(A). In Murillo's case, the judge set forth the following reasons for finding that the ends of justice would be served by a continuance:

Specifically, the court finds that the ends of justice and indeed the best interests of all parties and the public are served by enabling the Department of Justice a reasonable time within which to exercise its discretion as to whether to seek the death penalty against Defendants in this case. Depriving the Defendants of the opportunity to offer evidence and argue against a death penalty prosecution under the administrative procedures established by the Department of Justice, and denying the Department of Justice a reasonable opportunity to make a deliberate, fully informed decision about whether to seek the death penalty, would likely result in a miscarriage of justice. 18 U.S.C. § 3161(h)(8)(B)(i). Moreover, the nature of the prosecution of this case, combined with the nature of the potential penalty, render this case so unusual that it would be unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established under 18 U.S.C. § 3161, generally, and that the continuance sought by the Government, and joined in by co-Defendants Moseley and

Hironaga, is reasonable under the circumstances. 18 U.S.C. § 3161(h)(8)(B)(ii).

The record reveals no reason to declare the district court's reasons insufficient to justify periods of excludable delay under § 3161(h)(8)(B)(ii). Murillo cites *United States v. Perez-Reveles*, 715 F.2d 1348, 1352 (9th Cir.1983). However, in *Perez-Reveles* the district judge merely gave as reasons "the complexity of the trial and also the settlement pending." *Id.* at 1352. Moreover, in *Perez-Reveles*, the facts in the record did not support the judge's finding; the case involved a "single defendant, charged with a common violation of the narcotics laws", "the case took only two days to try", and "[n]o complex or unusual issues were raised by the Government or the defense." *Id.* at 1352–53.

■ More on point is *United States v. Murray*, 771 F.2d 1324 (9th Cir.1985) (per curiam), where the district court granted an "ends of justice continuance" to indict because of the complexity of the case against the defendant, the ongoing nature of the investigation, and the potential multiplicity of defendants. *Id.* at 1326. This Court found that the reasons stated by the district court—and their degree of particularity—to be "wholly in accordance" with the requirements of the ends of justice provision. *Id.* at 1328. There was no speedy trial error.

## II. *Murillo's Motion to Suppress*

On September 1, 1998 Murillo's car was seized from the street outside his apartment and towed to the Las Vegas Metropolitan Police Department crime lab. On September 2, a state search warrant that listed numerous categories of items to be searched for in Murillo's car was issued. However, none of these categories would have included the bath towels (e.g. there was no "trace evidence" category). On

September 3, the car was searched and the towels were seized. Murillo moved to suppress the introduction of the towels. That motion was denied.

■ Murillo now argues that the government lacked probable cause to seize and search his car. However, Murillo waived this ground by not raising it in his motion to suppress, and therefore we may not now consider it. Federal Rule of Criminal Procedure 12(b)(3) "requires that motions to suppress evidence be raised prior to trial" and "under Rule 12(f) failure to bring a timely suppression motion constitutes a waiver of the issue." *United States v. Wright*, 215 F.3d 1020, 1026 (9th Cir.2000). It does not matter that Murillo made a pre-trial motion to suppress on other grounds, for "just as a failure to file a timely motion to suppress evidence constitutes a waiver, so too does a failure to raise a particular ground in support of a motion to suppress." *Id.* (quoting *United States v. Restrepo–Rua*, 815 F.2d 1327, 1329 (9th Cir.1987)). Murillo's failure to raise the alleged want of probable cause in his motion to suppress places the issue beyond the scope of our ability to review for plain error. *Id.* "However, even issues that are deemed waived under Rule 12 may be addressed by this court and relief may be granted 'for cause shown.' " *Id.* at 1027. Because Murillo does not give any reasons for his failure to question probable cause in his motion to suppress, we will not now consider this argument.

## III. *Murillo's* Batson *Challenge*

The prosecution exercised a peremptory strike on Luzviminda Pafias. During voir dire, Pafias gave the following information about herself: that she has lived in Henderson, Nevada for seven years; that she was born in the Philippines; that she is a high school graduate; that she works as a blackjack dealer; that she has never read a book; and that her favorite television show is Judge Judy.

After the prosecution struck Pafias, Murillo objected under *Batson v. Kentucky,* 476 U.S. 79, 90, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), claiming that the strike evidenced purposeful intent to discriminate against Pafias because of her national origin. Murillo asserts that he is also Filipino, and the strike violated the *Batson* reading of the Fourteenth Amendment.

The prosecution propounded as race-neutral reasons for striking Pafias: her background as a casino employee, her claim that she had never read a book, and her statement that her favorite TV show is Judge Judy. The government also expressed its belief that the juror had difficulty communicating with counsel. The district court rejected Murillo's *Batson* challenge, and agreed with the government that Pafias had "difficulty ... communicating" and holding that this was a "valid reason" for a peremptory strike.

■ "The trial court's findings regarding purposeful discrimination in jury selection are entitled to 'great deference' and will not be set aside unless clearly erroneous." *United States v. Collins,* 90 F.3d 1420, 1430 (9th Cir.1996) (citations omitted). *Batson* sets forth a three-part test for determining whether a prosecutor has used peremptory strikes in a way that violates the Equal Protection Clause. *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). "First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination." *Hernan-*

dez v. New York, 500 U.S. 352, 358–59, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (per curiam) (citing *Batson*, 476 U.S. at 96–98, 106 S.Ct. 1712).

 In this case, the first step of the *Batson* analysis is moot. "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of . . . a prima facie showing becomes moot." *Id.* at 359, 111 S.Ct. 1859. Here, some of the race-neutral explanations for striking the juror were stronger than others. Her employment in a casino, if widely adopted, would exclude from jury service a large part of the Clark County population. However, the juror's claim that she never read a book, her statement that Judge Judy was her favorite TV show, and her apparent trouble communicating were permissible grounds for the prosecutor's peremptory challenge. "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Id.* at 360, 111 S.Ct. 1859. Here, the various reasons offered by the prosecution did not inherently suggest a discriminatory intent, and indeed, were race-neutral. "The second step of this process does not demand an explanation that is persuasive, or even plausible." *Purkett v. Elem*, 514 U.S. 765, 767–68, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam).

Although Murillo claims that difficulty communicating implies an inherent discriminatory intent, this court has held that "[s]o long as the prosecutor . . . can convince the district court that the potential juror who is being struck *in fact* has difficulty with English, the justification is race-neutral." *United States v. Changco*, 1 F.3d 837, 840 (9th Cir.1993).

"It is not until the *third* step that the persuasiveness of the justification becomes relevant—the step in which the trial court determines whether the opponent of the strike has carried the burden of proving purposeful discrimination. At that stage, implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Purkett*, 514 U.S. at 768, 115 S.Ct. 1769 (citations omitted).

The trial judge is in a unique position to determine whether a witness has difficulty communicating, and therefore we grant a high level of deference to the district court's finding on this point. It is difficult to ascertain from a transcript the level of a juror's command of spoken English. Pafias's English was not perfect: "I live in Henderson for seven years . . . I was high school graduate . . . I drive a car; and my bumper 'I'm Proud. My son is a member of Junior Honor Society.'" How slowly she spoke, whether she hesitated, how thick her accent was, and what her body language revealed are not recorded in a transcript, yet these are aspects of communication that may be considered by the trial judge.

 In this case, the Supreme Court's language is particularly helpful:

> In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies "peculiarly within the trial judge's province."

*Hernandez*, 500 U.S. at 365, 111 S.Ct. 1859 (citations omitted). Because the government advanced race-neutral reasons for striking Pafias, and because there is no reason to believe that the trial judge com-

mitted clear error in overruling Murillo's *Batson* objection, we defer to the trial judge's ruling. There was no *Batson* error.

We take this opportunity, once again, to emphasize the desirability of a clear and full record when a *Batson* challenge is made. Trial judges should relate their reasoning to the underlying constitutional grounds for *Batson's* restrictions on the peremptory challenge. Because of the "great deference" that we grant to the trial judge's ability to evaluate badges of discrimination in jury selection, our review is handicapped if there is not a clear record.

## IV. *MacGuigan's "Hearsay" Testimony*

On the night of her murder, Margello called MacGuigan from the Del Mar Motel, and told him that she was with Murillo and Hironaga. The government moved *in limine* to admit Margello's statement to MacGuigan as a present sense impression under Federal Rule of Evidence 803(1). This rule allows the admission of statements "describing or explaining an event or condition, or immediately thereafter." The declarant, but not the witness who overhears the declarant, must "have personal knowledge of the events described." *Bemis v. Edwards*, 45 F.3d 1369, 1373 (9th Cir.1995).

During the hearing on the motion in limine, Murillo conceded that the statement "I'm with Diana [Hironaga] and Rico [Murillo]" was a present sense impression under Rule 803(1), but challenged the statement under Federal Rule of Evidence 403, arguing that it was more prejudicial than probative, and was untrustworthy, because MacGuigan had given different versions of the statement in various interviews. The district court correctly ruled that MacGuigan's credibility could be attacked through cross-examination, and concluded that the statement was admissi-

ble because it was highly probative as to who was present in the hotel room with Margello on the night of her murder. The prejudice was no worse than any other damaging evidence placing a defendant at the scene of a crime.

▮▮▮▮ Murillo now argues that the district court's decision to admit this statement violated his Sixth Amendment right to confront and cross-examine the witnesses against him. Alleged violations of the Confrontation Clause are reviewed de novo. *United States v. Boone*, 229 F.3d 1231, 1233 (9th Cir.2000). Under the Confrontation Clause, hearsay is admissible only "if it bears adequate 'indicia of reliability.'" Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness." *Idaho v. Wright*, 497 U.S. 805, 814–15, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990) (citations omitted). The government admits that there is no case law holding that the present sense impression exception to the rule against hearsay is "firmly rooted." Therefore, the focus of the inquiry is whether there is a particularized guarantee of trustworthiness with respect to this statement.

▮▮▮▮ Murillo argues that "the fact that Mr. MacGuigan would be the witness to Margello's declaration made it patently untrustworthy." However, as the government correctly points out, the question of trustworthiness is applicable only to the circumstances of Margello's out-of-court statement, not to MacGuigan's in-court testimony. " '[P]articularized guarantees of trustworthiness' must be shown from the totality of the circumstances, but ... the relevant circumstances include only those that surround the making of the statement and that render *the declarant*

particularly worthy of belief." *Wright,* 497 U.S. at 819, 110 S.Ct. 3139 (emphasis added); *see also United States v. Barone,* 114 F.3d 1284, 1303 (1st Cir.1997), *cert. denied,* 522 U.S. 1021, 118 S.Ct. 614, 139 L.Ed.2d 500 (1997) ("[T]he focus of the trustworthiness inquiry is not on the in-court witness, but on the circumstances in which the declarant's out-of-court statements were made.") The hearsay witness, unlike the declarant, is present in court and can be cross-examined. Murillo does not argue that Margello was in any way untrustworthy. Indeed, there is little reason to doubt Margello's trustworthiness when she stated that she was with Murillo. She was nervous about the situation she was in, and was asking MacGuigan whether the people she was with—namely Hironaga and Murillo—were planning to harm her. She had no motive or incentive to lie. The district court did not err in allowing MacGuigan to testify that Margello told him that she was with Murillo during the night of her murder.

## V. *Excluded Evidence about Moseley's Putting Out a Contract on Hironaga's Life*

Murillo sought to introduce testimony from an informant that Moseley, while in jail awaiting trial, had discussed putting out a contract on Hironaga's life and escaping from custody. (Murillo made no offer to prove that anyone had actually put out a contract on Hironaga.) Murillo wanted to introduce the informant evidence under Rule 404(b) of the Federal Rules of Evidence, but the district court ruled that it could be introduced only under Rule 608(b) in cross examining Moseley. Murillo now assigns error to this ruling.

■ Federal Rule of Evidence 608(b) states in relevant part:

Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of a crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness ... concerning the witness' character for truthfulness or untruthfulness....

It was not for the purpose of showing Moseley's reputation for truthfulness or untruthfulness that Murillo wanted to present evidence of Moseley's contracting the death of Hironaga. Rather, Murillo sought to present this evidence for the purpose of "present[ing] to the jury the fact that Moseley did not try to arrange Murillo's death because Murillo was not a co-conspirator." Rule 404(b) states that although character evidence is not admissible to prove conduct, "[i]t may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident...." Without the ability to present the informant's testimony about Moseley's jail conversation under Rule 404(b), Murillo would have no counter to Moseley's expected denial of any such "contract" if questioned about it on cross examination. Murillo argues that the court erred in considering the informant's testimony to be "extrinsic" evidence. "Evidence of criminal activity other than the offense charged ... is not extrinsic evidence if it is inextricably intertwined with the evidence of the charged offense." *United States v. Smith,* 122 F.3d 1355, 1359 (11th Cir.1997) (per curiam). Murillo claims that had the jury been allowed to hear of Moseley's efforts to have Hironaga killed, Murillo would have been able to argue that Moseley's efforts indicated that Murillo was not involved in murdering Margello. The inference that Murillo sought to place before

the jury was that if Moseley did not try to kill Murillo, it was because Murillo was not in the conspiracy.

■■■ The district court's decision to admit or exclude evidence and the balancing of probative value against prejudicial effect are reviewed for abuse of discretion. *United States v. Leon–Reyes*, 177 F.3d 816, 821 (9th Cir.1999). Murillo's reasoning is dubious. The rule of *Smith* does not apply here because Moseley's planning (if any) to have Hironaga killed is not "inextricably intertwined" with the charged offense, namely the murder-for-hire of Margello. More importantly, evidence that Moseley wanted to have Hironaga killed does not support an inference that Moseley would not have been equally pleased to get rid of Murillo. The absurdity of Murillo's preferred inference becomes clear when one considers the converse of what Murillo sought to prove: if the prosecution had obtained evidence that Moseley tried to have Murillo killed, surely Murillo would not have conceded that this evidence pointed to Murillo's involvement in the conspiracy. The district court did not abuse its discretion when it excluded the evidence.

## VI. *Effect of Balignasa's Confession*

In its case-in-chief, the government asked FBI Special Agent Bret Shields whether the absent, unindicted Joseph Balignasa had admitted his role in Margello's murder. Shields replied that he had. Defense counsel objected, and outside the presence of the jury, moved for a mistrial. Without ruling on the motion for a mistrial, the judge gave a curative instruction to the jury to disregard any reference to Balignasa's alleged statement. The following day, at a hearing to determine the admissibility of Balignasa's statement, the court ruled that the statement was inadmissible because of the lack of particularized guarantees of trustworthiness in the circumstances of the custodial interrogation of Balignasa. Nonetheless, the court denied the motion for mistrial because the court had instructed the jury to disregard Agent Shield's testimony about Balignasa's confession.

In his post-trial motion for a new trial, Murillo argued that the government's improper elicitation of Agent's Shield's testimony about Balignasa's confession, combined with the government's references to Balignasa (but not to Balignasa's confession) in the closing argument, warranted a new trial. The district court denied that motion because it is not prejudicial error to allow into evidence the admission of culpability by a declarant when the admission does not inculpate the defendant. The district court correctly held that "given the strength of the admissible evidence against Mr. Murillo, and the strong admonition to the jury by the court, Mr. Murillo cannot show that he was unfairly prejudiced by the prosecutorial error."

■■■ Murillo raises two issues on appeal in challenging the district court's denial of his motion for mistrial and his motion for a new trial. First, with respect to the introduction of Balignasa's confession: whether it was inadmissible hearsay, in violation of *Bruton* and the Confrontation Clause; and second, whether the curative jury instruction rendered the prosecutorial error harmless beyond a reasonable doubt. There was no Confrontation Clause violation because the reference to Balignasa's alleged confession did not inculpate Murillo. *See Williamson v. United States*, 512 U.S. 594, 605, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994) (O'Connor, J., concurring) ("[T]he very fact that a statement is genuinely self-inculpatory ... is itself one of the 'particularized guarantees of trustworthiness' that makes a statement admissible under the Confrontation Clause."). It was a prosecutorial blunder,

which if intentional, was misconduct, but it did not prejudice Murillo, and the blunder was effectively cured by the instruction to the jury to disregard it. Even if there had been a Confrontation Clause violation, it was subject to harmless error analysis. *United States v. Ortega*, 203 F.3d 675, 682 (9th Cir.2000).

The district court's denial of a motion for a new trial based on prosecutorial misconduct is reviewed for an abuse of discretion. *United States v. Scholl*, 166 F.3d 964, 974 (9th Cir.1999). The denial of a motion for mistrial is also reviewed for an abuse of discretion. *United States v. Sarkisian*, 197 F.3d 966, 981 (9th Cir. 1999). Because the error, if any, was harmless beyond a reasonable doubt, the district court did not abuse its discretion in refusing to grant a new trial.

AFFIRMED.