FILED

Apr 18 2019, 10:05 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Mark Small
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Caroline G. Templeton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Ronald Richardson, *Appellant-Defendant,* | April 18, 2019 |
| v. | Court of Appeals Case No. 18A-CR-2263 |
| | Appeal from the Fayette Circuit Court |
| State of Indiana, *Appellee-Plaintiff.* | The Honorable Hubert Branstetter, Jr., Judge |
| | Trial Court Cause No. 21C01-1512-F2-968 |

**Bradford, Judge.**

# Case Summary

On December 2, 2015, Ronald Richardson sold approximately $70 worth of heroin to Shannon Burroughs. When he was arrested a short time later, he was in possession of heroin, cocaine, and marijuana. He was subsequently convicted of Level 4 felony dealing in a narcotic drug and sentenced to a ten-year term of incarceration. On appeal, he contends (1) that the trial court abused its discretion in allowing the State to strike the only African-American member of the venire (the "potential juror") from the jury, (2) the trial court abused its discretion in admitting certain evidence, (3) his rights protecting the prohibition against double jeopardy were violated, and (4) the evidence is insufficient to sustain his convictions. Concluding that trial court properly found that the State proffered a race-neutral reason for striking the potential juror from the jury; the trial court did not abuse its discretion in admitting the challenged evidence; Richardson was only convicted of one crime and, thus, was not subjected to double jeopardy; and the evidence is sufficient to sustain his conviction for Level 4 felony dealing in a narcotic drug, we affirm.

# Facts and Procedural History

On December 2, 2015, Burroughs was associating with Ciera Golay and Robert Thomas when she arranged to purchase heroin from Richardson. Burroughs arranged to purchase seven "caps" from Richardson for $10 per cap. A cap is about a tenth of a gram of heroin packaged in a clear capsule. Burroughs

agreed to meet Richardson at a Village Pantry in Wayne County to complete the purchase.

[3]     Richardson arrived at the Village Pantry with his girlfriend Comfort Bair and one of Bair's friends. Bair was driving and Richardson was sitting in the backseat. When she arrived, Burroughs sat in the front passenger seat of the vehicle and gave Bair the money. Richardson gave Burroughs a "hand full" of caps, more than the seven they had discussed. Tr. Vol. I p. 124. Burroughs took the caps and returned to Golay's vehicle. Once in the vehicle, Burroughs told Golay to "go" because she "knew the $50.00 bill" that she had given to Bair "was fake." Tr. Vol. I p. 127.

[4]     Bair followed when Golay left the Village Pantry. The vehicles traveled "erratically" and at a high rate of speed. While Bair was following Golay, Department of Natural Resources Conservation Officer Grahm Selm received a dispatch from the Union County Sheriff's Department that two white vehicles traveling southbound on State Road 27 were traveling at a high rate of speed, passing multiple vehicles at once, blocking oncoming traffic, and making the oncoming traffic go onto the shoulder. Officer Selm observed the two vehicles near Liberty and started following them. Both vehicles turned westbound onto State Road 44 towards Connersville. Officer Selm continued to follow the vehicles, at one point reaching 100 miles per hour. The vehicles were eventually stopped on 5th Street in Connersville by Connersville Police Officers, including Officer Brad Rosser.

[5] Recognizing that his vehicle was about to be stopped by police, Richardson threw a baggie containing capsules of heroin and cocaine to Bair and instructed her to hide the drugs. Bair complied by putting the baggie containing the drugs "inside" her. Tr. Vol. I p. 151. Also at Richardson's instruction, Bair's friend put a baggie containing marijuana "inside" her. Tr. Vol. I p. 152.

[6] Once the vehicles had been stopped, Officer Rosser searched the vehicle in which Burroughs had been a passenger. During the search, he found a coat that had twenty-three capsules in the pocket. Subsequent testing revealed that the capsules contain heroin. After Bair was arrested and transported to the Fayette County Jail, she removed the baggie containing the capsules of heroin and cocaine from her vagina.

[7] On December 4, 2015, the State charged Richardson with Level 2 felony dealing in a narcotic drug, Class A misdemeanor dealing in marijuana, and Class B misdemeanor visiting a common nuisance. Prior to trial, the State dismissed the dealing-in-marijuana and visiting-a-common-nuisance charges and amended the remaining dealing charge to a Level 3 felony. At the conclusion of trial, the jury returned guilty verdicts for the lesser-included offenses of Level 4 and Level 5 felony dealing in a narcotic. The trial court entered judgment on the Level 4 dealing charge and sentenced Richardson to a ten-year term of imprisonment.

# Discussion and Decision

# I. Jury Selection

"Purposeful racial discrimination in selection of the venire violates a defendant's right to equal protection because it denies him the protection that a trial by jury is intended to secure." *Batson v. Kentucky*, 476 U.S. 79, 86 (1986). "The exclusion of even a sole prospective juror based on race, ethnicity, or gender violates the Fourteenth Amendment's Equal Protection Clause." *Addison v. State*, 962 N.E.2d 1202, 1208 (Ind. 2012).

"A defendant's race-based *Batson* claim involves a three-step process." *Id.* "At the first stage the burden is low, requiring that the defendant only show circumstances raising an inference that discrimination occurred." *Id.* "This is commonly referred to as a 'prima facie' showing." *Id.*

At the second stage, "the burden shifts to the prosecution to offer a race-neutral basis for striking the juror in question." *Id.* at 1209 (internal quotation omitted). "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Id.* (internal quotation omitted). "Although the race-neutral reason must be more than a mere denial of improper motive, the reason need not be particularly persuasive, or even plausible." *Id.* (internal quotation omitted). "At this second step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (per curiam) (internal brackets and quotation omitted).

[11]     At the third stage, the trial court must determine whether, in light of the parties' submissions, the defendant has shown purposeful discrimination. *Cartwright v. State*, 962 N.E.2d 1217, 1221 (Ind. 2012). "The trial court, not the appellate court, is in the best position to consider the juror's demeanor, the nature and strength of the parties' arguments, and the attorney's demeanor and credibility." *Blackmon v. State*, 47 N.E.3d 1225, 1234 (Ind. Ct. App. 2015). "The issue is whether the trial court finds the prosecutor's race-neutral explanation credible." *Roach v. State*, 79 N.E.3d 925, 929 (Ind. Ct. App. 2017). "Although the burden of persuasion on a *Batson* challenge rests with the party opposing the strike, the third step—determination of discrimination—is the 'duty' of the trial judge." *Cartwright*, 962 N.E.2d at 1221 (internal citations omitted). "The trial court evaluates the persuasiveness of the step two justification at the third step." *Id.* "It is then that implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Id.* (internal quotation omitted). "Also, at the third stage, the defendant may offer additional evidence to demonstrate that the proffered justification was pretextual." *Id.*

[12]     In this case, at the first stage, it is undisputed that Richardson made a prima facie case that the State's peremptory challenge suggested an inference of discrimination because the potential juror was the only African-American member of the venire. *See id.* at 1222 (noting that removal of the only African-American juror that could have served on the jury is sufficient to establish a prima facie case under *Batson*). The first stage was therefore satisfied, and the

burden then shifted to the State to present a race-neutral reason for striking the potential juror.

[13] As for the second stage, the record reveals that during voir dire, the potential juror indicated that she liked to read and watch television. When asked what she liked to read and watch, the potential juror indicated "stories about the law." Tr. Vol. I p. 62. She indicated that she "really like[d] Law & Order" and had "seen every episode of Perry Mason." Tr. Vol. I p. 62. The potential juror then told the deputy prosecutor that she thought "beyond [a] reasonable doubt" meant "[t]hat you have sufficient evidence to convince us that your case is bigger than the other persons in that this person is guilty." Tr. Vol. I p. 62. The deputy prosecutor responded by clarifying that the jurors "will not be comparing cases … [t]hats not how a criminal case works" and informed the venire that she, as the State's representative, had the "burden to prove each of the elements of the crime charged." Tr. Vol. I pp. 62, 63. In explaining her desire to strike the potential juror, the deputy prosecutor indicated that she observed the potential juror (1) enjoys reading and watching books and programs that are law-related, (2) to be aggressive and dominant, and (3) to have dominant body language. Defense counsel responded, stating "Judge, (inaudible) her ethnicity (inaudible) uh, State proper reason uh, I think um, I don't have any other (inaudible)." Tr. Vol. I p. 77. The State's reasons for striking the potential juror were facially valid and race neutral. Thus, the second stage was satisfied.

[14] Once the first and second stages had been satisfied, the issue proceeded to the third stage. Again, at this stage, the trial court evaluated the persuasiveness of the State's justification and considered whether the justification was valid or mere pretext. *See Cartwright*, 962 N.E.2d at 1221. After considering the State's proffered justification, the trial court granted the State's request to strike the potential juror, stating, "We'll note [defense counsel's] objection for the record and we'll find that the reasons articulated by the State are appropriate reasons for striking [potential juror] at this time." Tr. Vol. I p. 77.

[15] Upon review, we conclude that the trial court properly determined that the State articulated a race-neutral reason for using a peremptory challenge to strike the potential juror from the jury. The potential juror indicated during voir dire that she had an interest in law-related books and television shows, and her enjoyment of these mediums may have left her with an inaccurate understanding of criminal proceedings. The potential juror's interest in law-related books and television shows has been found to be a permissible ground for the State's peremptory challenge. *See United States v. Farhane*, 634 F.3d 127, 157–58 (2d Cir. 2011) (providing that it was plausible for the prosecutor to think that a juror who regularly watched television shows such as CSI might be more inclined to think that forensic evidence is necessary to prove guilty); *United States v. Murillo*, 288 F.3d 1126, 1136 (9th Cir. 2002) (finding that the juror's statement that Judge Judy was her favorite television show was a permissible ground for the prosecutor's peremptory challenge).

Further, despite Richardson's claim to the contrary, when making its determination as to whether the State provided a race-neutral reason for striking the potential juror, the trial court was not required to make factual findings to support its reasoning. *See Cartwright*, 962 N.E.2d at 1222 (providing that neither state nor federal law require a trial court to make explicit findings when deciding whether the State offered a race-neutral reason for striking a potential juror); *Blackmon*, 47 N.E.3d at 1234 (indicating that the trial court is not required to make explicit findings every time the prosecution justifies a peremptory strike based on a juror's demeanor). The trial court made its ruling immediately following the parties' questioning of the potential juror during voir dire and its observations and memories of the potential juror's demeanor would have been fresh in the trial court's mind. Nothing in the record calls into question the deference owed to the trial court's evaluation of the demeanor of the individuals and parties appearing before it. Richardson has failed to establish error in this regard.

## II. Admission of Evidence

"We review the trial court's ruling on the admission of evidence for an abuse of discretion." *Espinoza v. State*, 859 N.E.2d 375, 381 (Ind. Ct. App. 2006). "We reverse only where the decision is clearly against the logic and effect of the facts and circumstances." *Id.* According to Richardson, the trial court abused its discretion by admitting Exhibits 3, 6, and 7 because the State failed to present an adequate chain of custody for the items.

[18]     An adequate foundation establishing a continuous chain of custody is established if the State accounts for the evidence at each stage from its acquisition, to its testing, and to its introduction at trial. Under the chain of custody doctrine, an adequate foundation is laid when the continuous whereabouts of an exhibit is shown from the time it came into the possession of the police.

To establish a proper chain of custody, the State must give reasonable assurances that the evidence remained in an undisturbed condition. However, the State need not establish a perfect chain of custody, and once the State strongly suggests the exact whereabouts of the evidence, any gaps go to the weight of the evidence and not to admissibility. Moreover, there is a presumption of regularity in the handling of evidence by officers, and there is a presumption that officers exercise due care in handling their duties. To mount a successful challenge to the chain of custody, one must present evidence that does more than raise a mere possibility that the evidence may have been tampered with.

*Id.* at 382 (internal citations and quotations omitted).

[19]     Richardson claims that the trial court abused its discretion in admitting the challenged Exhibits because of a gap in the chain of custody of the evidence, thereby suggesting that the evidence may have been tampered with. Exhibit 3 was an evidence bag containing capsules of heroin that were found in the pocket of a coat recovered from Burroughs's vehicle. Officer Rosser collected

the capsules at the scene, placed them in a tamper-proof evidence bag,[1] sealed the bag, and filled out the necessary identifying information. Exhibit 6 was a white rock-like substance, which was subsequently determined to be 3.66 grams of cocaine, and Exhibit 7 was a number of capsules containing heroin. Exhibits 6 and 7 were recovered from Bair's person. Nancy Bohlander, a jail officer at the Fayette County Jail who observed Bair remove a bag containing the cocaine and the capsules from her person upon being booked into custody, placed the contraband in an evidence bag and gave it to Officer Rosser.

[20] In challenging the chain of custody of Exhibits 3, 6, and 7, Richardson argues that the Exhibits were unaccounted for from April 10, 2017 to August 8, 2018. We disagree. The following dates detail the custody chain of the challenged Exhibits:

| December 2, 2015 | Officer Rosser deposited Exhibits 3, 6, and 7 into a secure storage in the evidence room of the Connersville Police Department ("the Department"). The Exhibits were subsequently logged into the evidence room by the Department's evidence custodian and continued to be stored in the secure evidence room. |
| --- | --- |
| April 10, 2017 | Exhibits 3 and 6 were transported and relinquished to the Indiana State Police ("ISP") Lab for testing. |
| June 2, 2017 | Exhibits 3 and 6 were returned to the Department and placed in the evidence room. |

---

[1] While markings on the evidence bag indicated that it contained twenty-one capsules, Exhibit 4, which depicted the contents of Exhibit 3 together with the other items recovered from the coat shows twenty-three capsules. Considering Exhibits 3 and 4 together with the evidence that the bag was sealed and did not appear to have been tampered with and Officer Rosser's acknowledgment that it was possible that he miscounted the capsules when he logged the evidence, one may reasonably assume that the indication that the bag contained only twenty-one capsules was a scrivener's error and that the bag actually contained twenty-three capsules.

| June 2, 2017 | Exhibit 7 was transported and relinquished to the ISP Lab for testing. |
| July 7, 2017 | Exhibit 7 was returned to the Department and placed in the evidence room. |
| August 8, 2018 | Exhibits 3, 6, and 7 were removed from evidence room for court and returned the same day. |
| August 13, 2018 | Exhibits 3, 6, and 7 were removed from the evidence room for court. |

[21]   The record demonstrates that the Exhibits were placed in the Department's evidence room on December 2, 2015.  The Exhibits remained in the evidence room until being sent to the ISP Lab for testing.  Once testing was complete, the Exhibits were returned to the evidence room.  The Exhibits then remained in the Department's evidence room until being removed for trial.  The technician who tested the Exhibits at the ISP Lab testified that the Exhibits appeared in the same condition as on the day when she concluded her testing.  The record does not include any gaps in the chain of custody for Exhibits 3, 6, or 7.

[22]   Moreover, even if Richardson had been able to establish some gap in the chain of custody, his challenge to the admission of the Exhibits fails.  Again, to mount a successful challenge to the chain of custody, Richardson was required to present evidence that does more than raise a mere possibility that the evidence may have been tampered with.  *Id.*  He did not do so.  As such, the alleged gap in the chain of custody goes to the weight of the evidence and not to admissibility.  *Id.*  The trial court, therefore, did not abuse its discretion by admitting Exhibits 3, 6, or 7 into evidence.  *See Troxell v. State*, 778 N.E.2d 811, 815 (Ind. 2002) (concluding that while the defendant had pointed to potential

gaps in the chain of custody and alleged that the evidence may have been subject to tampering during said gaps, he presented no evidence supporting the allegation and, because of the presumption of regularity in handling evidence, there was no error in admitting the challenged evidence).

## III.  Double Jeopardy

[23]  Both the Fifth Amendment of the United States Constitution and Article I, Section 14 of the Indiana Constitution provide that no one shall be put in jeopardy *twice* for the same offense.  (Emphasis added).  Richardson claims that he was convicted of both Level 4 felony and Level 5 felony dealing and that because these convictions punished him for the same offense, punishment for both "inherently violates [his] rights to be free from double jeopardy." Appellant's Br. p. 25.  While the original sentencing order did reference convictions for both Level 4 felony dealing and Level 5 felony dealing, both the trial court's amended sentencing order and the abstract of judgment indicate that Richardson was convicted of only the Level 4 felony dealing charge. Given that Richardson was convicted of only one count of Level 4 felony dealing, his double jeopardy claim fails, as he was not punished twice for his actions in violation of Article I, Section 14 or the Fifth Amendment.

## IV.  Sufficiency of the Evidence

[24]      When reviewing the sufficiency of the evidence to support a
          conviction, appellate courts must consider only the probative
          evidence and reasonable inferences supporting the verdict.  It is
          the fact-finder's role, not that of appellate courts, to assess
          witness credibility and weigh the evidence to determine whether

it is sufficient to support a conviction. To preserve this structure, when appellate courts are confronted with conflicting evidence, they must consider it most favorably to the trial court's ruling. Appellate courts affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. It is therefore not necessary that the evidence overcome every reasonable hypothesis of innocence. The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict.

*Drane v. State*, 867 N.E.2d 144, 146–47 (Ind. 2007) (citations, emphasis, and quotations omitted).

[25] Initially, we note that Richardson's claim regarding the sufficiency of the evidence was based entirely on his claim that the trial court abused its discretion in admitting Exhibits 3, 6, and 7. However, given our conclusion that the trial court did not abuse its discretion in that regard, the jury could consider the Exhibits in determining that the State produced sufficient evidence to prove Richardson's guilt.

[26] In order to convict Richardson of Level 4 felony dealing in a narcotic drug, the State was required to prove that Richardson knowingly or intentionally delivered or possessed with the intent to deliver between one and five grams of heroin. Ind. Code § 35-48-4-1. The evidence establishes that Richardson possessed 4.29 grams of heroin, which he instructed Bain to hide when his vehicle was stopped by police. He also sold 3.0 grams of heroin to Burroughs. The evidence is sufficient to sustain Richardson's conviction.

[27] The judgment of the trial court is affirmed.

Tavitas, J., concurs.

Crone, J., concurs in part and concurs in result in part with opinion.

Ronald Richardson,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

Court of Appeals Case No.
18A-CR-2263

**Crone, Judge, concurring in part and concurring in result in part.**

[28]    I fully concur as to issues II through IV, but I write separately to express my concerns regarding the *Batson* analysis in issue I.

[29]    With respect to the first stage of the three-stage *Batson* process, I agree with my colleagues that "Richardson made a prima facie case that the State's peremptory challenge suggested an inference of discrimination because the potential juror was the only African-American member of the venire."  Slip op. at 6.

[30]    Once the defendant makes a prima facie showing, the burden then shifts to the State in the second stage to come forward with a race-neutral explanation for challenging a venireperson.  In this case, the prosecutor gave the following reasons for striking the potential juror:

> [W]e found [the potential juror] to be um, aggressive and dominant in the conversation um, in her answering she was always the first to speak out um, she's—was very um, in her language it was "I" uh, we're looking for a group so when we're analyzing juries we're looking for more of what we will decide. She had dominant body language and under our system of what we look for in life experience, in personality what is exhibited here in um, the kinds of t.v. shows that she enjoys, the kinds of reading um, and the kinds of hobby activities she fits into the category um, for us to strike and not want on the jury.

Tr. Vol. 1 at 76. At that point, the trial court did not make a specific finding that these reasons were race neutral.

[31] "At the third and last stage of a *Batson* inquiry, 'in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.'" *Addison*, 962 N.E.2d at 1209 (quoting *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008)). "Although the burden of persuasion on a *Batson* challenge rests with the party opposing the strike, the third step—determination of discrimination—is the 'duty' of the trial judge." *Id.* at 1210 (citation omitted). "The trial court evaluates the persuasiveness of the step two justification at the third step. It is then that 'implausible or fantastic justification may (and probably will) be found to be pretexts for purposeful discrimination.'" *Id.* (quoting *Purkett*, 514 U.S. at 768). "The issue is whether the trial court finds the prosecutor's race-neutral explanation credible." *Id.* "'[T]he rule in *Batson* provides an opportunity to the prosecutor to give the reason for striking the juror, and it requires the judge to assess the plausibility of that reason in light of all evidence with a bearing on it.'" *Id.* (quoting *Miller-El*

*v. Dretke*, 545 U.S. 231, 251-52 (2005)). "Also, at the third stage, the defendant may offer additional evidence to demonstrate that the proffered justification was pretextual." *Id*.

[32] Here, Richardson apparently offered no additional evidence to demonstrate that the prosecutor's proffered justifications for striking the potential juror were pretextual. *See* Tr. Vol. 1 at 77 ("Judge, (inaudible) her ethnicity (inaudible) uh, State proper reason uh, I think um, I don't have any other (inaudible).").[2] And ultimately, the trial court found "that the reasons articulated by the [prosecutor were] *appropriate* reasons for striking [the potential juror] at [that] time." *Id*. (emphasis added). In this context, I presume that "appropriate" means both "race neutral" and "credible" for *Batson* purposes.[3]

[33] The prosecutor's reasons for striking the potential juror are race neutral on their face. But the transcript flatly contradicts the prosecutor's assertion that the potential juror was "aggressive and dominant in the conversation" and "was always the first to speak out." She spoke only when spoken to and succinctly answered the questions asked of her. Tr. Vol. 1 at 61-63, 68, 75. As for the potential juror's allegedly "dominant body language," i.e., demeanor, the trial

---

[2] As this excerpt suggests, the quality of the voir dire transcript leaves much to be desired. *Cf. Childress v. State*, 96 N.E.3d 632, 636-37 (Ind. Ct. App. 2018) (noting "significant deficiencies in the transcript" of voir dire proceedings in addressing appellant's *Batson* argument).

[3] I do not share Richardson's concern that the trial court conflated the second and third stages of the *Batson* process. We presume that a trial court knows and follows the applicable law. *Tharpe v. State*, 955 N.E.2d 836, 842 (Ind. Ct. App. 2011), *trans. denied*.

court made no specific finding to support the prosecutor's assessment. We have acknowledged that U.S. Supreme Court precedent does not require "a trial court to make explicit findings every time the prosecution justifies a peremptory strike based on a juror's demeanor[,]" *Blackmon*, 47 N.E.3d at 1234, but making such findings is clearly the better practice in light of an appellate court's inability to judge a potential juror's demeanor, and I urge the Indiana Supreme Court to require such findings in Indiana trial courts to promote both fairness and judicial economy. *Cf. Roach*, 79 N.E.3d at 931-32 (remanding for determination regarding credibility of prosecutor's demeanor-based reason for striking juror, where second reason for striking juror was not supported by the record).

[34] Regarding the potential juror's media preferences, my colleagues state that a "potential juror's interest in law-related books and television shows has been found to be a permissible ground for the State's peremptory challenge." Slip op. at 8 (citing *Farhane*, 634 F.3d at 157-58, and *Murillo*, 288 F.3d at 1136). In *Farhane*, the prosecutor specifically argued that the potential juror's "frequent television viewing of the three 'CSI' television shows might make him reluctant to convict in the absence of scientific evidence." 634 F.3d at 157. Here, however, the prosecutor made no specific argument regarding the potential juror's choice of books and television shows. My colleagues merely speculate that the potential juror's "enjoyment of these mediums may have left her with an inaccurate understanding of criminal proceedings," slip op. at 8, and

overlook her apparent willingness to maintain an open mind and follow the law:

> [PROSECUTOR]: … Uh, Ms. Smithson, what do you think beyond reasonable doubt is?
>
> [POTENTIAL JUROR]: That you have sufficient evidence to convince us that your case is bigger than the other persons in that this person is guilty or what you (inaudible)
>
> [PROSECUTOR]: Okay um, (inaudible) first part agree with that. There's one little place where I disagree. You will not be comparing cases (inaudible)
>
> [POTENTIAL JUROR]: Oh.
>
> [PROSECUTOR]: That's not how a criminal case works. (Inaudible) but a criminal case it's my burden to prove each of the elements of the crime charged. (Inaudible) and you have to deliberate, what would your verdict be?
>
> [POTENTIAL JUROR]: Not guilty.
>
> [PROSECUTOR]: Because there's not any evidence. You have to be convinced by the evidence and beyond a reasonable doubt (inaudible) but it's not beyond all doubt but it's a high burden.

Tr. Vol. 1 at 62-63. Although the transcript's quality is poor, one could reasonably infer that the prosecutor asked the potential juror what her verdict would be if she had to render one before any evidence was presented, and she correctly answered that she would have to find the defendant not guilty.

In *Murillo*, the appellate court ruled that the potential juror's "statement that Judge Judy was her favorite TV show" was a "permissible ground[] for the prosecutor's peremptory challenge[,]" in that it "did not inherently suggest a discriminatory intent" and was "race-neutral." 288 F.3d at 1136. But the opinion does not say why the prosecutor found the potential juror's fondness for Judge Judy objectionable. Although a prosecutor's explanation for exercising a peremptory strike "need not rise to the level justifying exercise of a challenge for cause[,]" *Batson*, 476 U.S. at 97, I believe that a prosecutor facing a *Batson* challenge should be required to offer some justification as to why a potential juror's media preferences could affect that person's fitness to be a juror. Otherwise, we risk allowing such preferences to become shorthand, *Batson*-proof bases for exercising peremptory strikes (e.g., anyone who likes to watch Judge Judy is unfit to be a juror). *See Minetos v. City Univ. of N.Y.*, 925 F. Supp. 177, 184-85 (S.D.N.Y. 1996) ("Subjective reasons offered by counsel to justify peremptory challenges (such as the juror's hairstyle, bad facial expression, body language, or over-responsiveness to opposing counsel) will be evaluated by the trial court and the peremptory challenge will be sustained if the trial court confirms there is a sound and credible basis for it. Of course, listing in this manner has the unfortunate effect of creating a how-to guide for defeating *Batson* challenges. Such guidelines do not ensure that juror strikes are

not racially motivated—only that advocates are on notice of which reasons will best survive judicial review.") (footnote omitted).[4]

[36] All that being said, absent any existing requirement for trial courts to make findings regarding a potential juror's demeanor or for prosecutors to offer some justification for striking a potential juror based on his or her media preferences, I must reluctantly defer to the trial court, who was uniquely situated to assess the potential juror's allegedly "dominant body language" and determine the credibility of the prosecutor's objection to her choice of books and television shows. My reluctance is heightened by the lack of evidence supporting the prosecutor's assertion that the potential juror was "aggressive and dominant in the conversation," but in the end I must conclude that Richardson has failed to establish that the trial court clearly erred in denying his *Batson* challenge. Accordingly, I concur in result as to issue I.

---

[4] The district judge in *Minetos* echoed Justice Thurgood Marshall's call in his concurring opinion in *Batson* to end "peremptory challenges and the racial discrimination they perpetuate." 925 F. Supp. at 185.