IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 99-50279

_____

UNITED STATES OF AMERICA,                           Plaintiff-Appellee,

versus

JESSE "CHANGO" GOMEZ, JR., also
known as Changito Gomez; PETE
CARRION; REMIGIO "TITO" GOMEZ;
ROBERT "ROBE" HERRERA, also
known as Rove Herrera, Jr.;
JUAN "JON JON" JOHNS; MARTIN
"PANCAKE" ORTEGON; ROBERT
"BEAVER" PEREZ; VICTOR "TITO"
PENA; MICHAEL PEREZ; LOUIS
"BIG LOU" MORALES,                              Defendants-Appellants.
_____

Appeal from the United States District Court
for the Western District of Texas
(SA-98-CR-265-6)
_____

September 16, 2002

Before JOLLY, DUHÉ, and DENNIS, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:[1]

This appeal arises from convictions of drug traffickers
alleged to be members of the "Texas Mexican Mafia." The record is
replete with evidence of murders, extortion, drug dealing and
robberies. Jesse Gomez, Jr., Pete Carrion, Remigio Gomez, Robert
Herrera, Juan Johns, Martin Ortegon, Robert Perez, Victor Pena,
Michael Perez, and Louis Morales ("Appellants") were convicted of
racketeering and racketeering conspiracy. Each was sentenced to

_____

[1]Pursuant to 5TH CIR. R. 47.5, the Court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

life imprisonment.  They appeal their convictions and sentences on numerous grounds.  Finding no reversible error, we AFFIRM.

I

Appellants were indicted, along with six other individuals, for racketeering and racketeering conspiracy, in violation of 18 U.S.C. § 1962(c) and (d).  The indictment alleged 22 racketeering acts, including 15 murders, two attempted murders, two robberies, and possession with intent to distribute marijuana, cocaine, and heroin; and 35 overt acts in furtherance of the racketeering conspiracy.  Appellants were alleged to be members of the Texas Mexican Mafia, headquartered in San Antonio.  The Mexican Mafia had a written constitution that described its purposes and activities, which expressly included drug dealing, assassination, prostitution, "robberies of the highest degree," gambling, extortion, weapons, "or any and every other thing criminally imaginable."

Appellant Robert Perez, the "General," allegedly carried out the wishes of unindicted co-conspirator Huerta, the President of the Mexican Mafia, who was in prison throughout the time of the alleged racketeering activity.  The remaining Appellants were alleged to have held the following positions in the Mexican Mafia: Herrera was a Captain; Morales and Ortegon were Lieutenants; Jesse and Remigio Gomez and Johns were Sergeants; and Pena, Michael Perez, and Carrion were Soldiers.

Five of the persons indicted pleaded guilty before trial, and one during trial.  The ten remaining defendants (Appellants) were

convicted of both counts after a six-week trial. All were sentenced to concurrent life terms on each count.

II

Appellants raise the following issues on appeal: (1) the district court clearly erred in rejecting their challenge to the Government's strike of a prospective juror; (2) the district court abused its discretion by denying defense motions for severance; (3) the district court abused its discretion by denying defense motions for transfer of venue and a hearing on the motions; (4) the district court abused its discretion by admitting gang expert testimony that did not satisfy Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993); (5) the district court committed plain error by instructing the jury that the Government need only show a minimal effect on interstate commerce; (6) the evidence is insufficient to prove that the defendants participated in a pattern of racketeering activity and conspired to do so, and to prove venue and the requisite effect on interstate commerce; (7) their convictions must be reversed because of violations of Brady v. Maryland, 373 U.S. 83 (1963), Giglio v. United States, 405 U.S. 150 (1972), and the Jencks Act, 18 U.S.C. § 3500; (8) the district court abused its discretion by not submitting a special verdict form; (9) the district court committed plain sentencing error under Apprendi v. New Jersey, 530 U.S. 466 (2000); and (10) the district court abused its discretion by denying Ortegon a hearing on his

3

motion for a new trial.[2]  With the exception of the first issue
listed above, the remaining issues are without merit and we shall
dispose of them with very little discussion.

A

Peremptory Strike

Appellants objected to the Government's peremptory strike of
Hispanic veniremember De La O.[3]  When asked to explain the reason
for the strike, the prosecutor stated that De La O had a very
strong accent and the Government was concerned about his ability to
communicate with other jurors, as well as the facts that he is
single and is a special education teacher.  The Government's sworn
written response stated that four persons seated at the
Government's counsel table believed that De La O and the court had
difficulty communicating during voir dire, and that the prosecution
believed that, as a special education teacher, De La O would be
particularly sensitive and sympathetic to the circumstances of the
defendants.  The district court, after reviewing the Government's
written reasons, accepted them as race-neutral, stating:

> The Court has reviewed the reasons given by
> the Government as to the challenges, the
> written responses of the Government.  The

---

[2]Appellants each adopt most of the issues raised by the
others.

[3]Appellants also objected to other peremptory challenges by
the Government, but the only strike they raise on appeal is that of
De La O.  Remigio Gomez adopts this issue despite the fact that his
counsel expressly opted out of the objection at trial; he claims
ineffective assistance of counsel.

4

court is sensitive to this matter, my parents telling me that they are Hispanic and that more likely that might make me one as well, the Court is extra sensitive to that issue. The Court recalls the questions that the Court itself asked and responses, and the Court is satisfied the reasons given by the Government are not based on any racial grounds, but were legitimate reasons for striking these individuals and will deny the Defense motion with regard to those five strikes that were made by the Government as to five gentlemen that appear to be of Latino or Hispanic descent.

The jury was composed of eight whites and four Hispanics.

Appellants argue that the prosecutor's reasons for striking De La O are not race-neutral, because his Spanish accent is intrinsically intertwined with his Hispanic ethnicity and thus should be viewed as a surrogate for his ethnicity. They argue that the Government's reliance on his accent is a pretext for discrimination, because De La O did not have any difficulty in understanding the questions asked by the judge or communicating his answers during voir dire, and he was a trained professional educator who spoke fluent English. They observe that the Government did not strike four unmarried jurors, one of whom is also a teacher.

We review the district court's determination that the Government did not engage in purposeful discrimination under the clearly erroneous standard. E.g., United States v. Pofahl, 990 F.2d 1456, 1466 (5th Cir. 1993). "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered

5

will be deemed race neutral." <u>Hernandez v. New York</u>, 500 U.S. 352, 357 (1991). Great deference is given to the district court's finding, because it is based primarily on an evaluation of the credibility or demeanor of the attorney who exercises the challenge. <u>Id</u>. at 365.

The Ninth Circuit recently addressed a similar situation in <u>United States v. Murillo</u>, 288 F.3d 1126, 1135-37 (9th Cir. 2002), *petition for cert. filed* (Jul. 24, 2002) (No. 02-5778). In that case, the defendant, a Filipino, challenged the prosecution's exercise of a peremptory strike of a Filipino prospective juror. <u>Id</u>. at 1135. The prosecutor offered the following reasons for the strike: the prospective juror's background as a casino employee, her statement that she had never read a book, her statement that her favorite television show was "Judge Judy," and her difficulty in communicating. <u>Id</u>. The Ninth Circuit stated that "the various reasons offered by the prosecution did not inherently suggest a discriminatory intent, and indeed, were race-neutral." <u>Id</u>. at 1136. The court rejected the defendant's contention that "difficulty communicating implies an inherent discriminatory intent," noting that it had previously held that "'[s]o long as the prosecutor . . . can convince the district court that the potential juror who is being struck *in fact* has difficulty with English, the justification is race-neutral.'" <u>Id</u>. (brackets and italics in

6

original; quoting United States v. Changco, 1 F.3d 837, 840 (9th Cir. 1993)).

We agree with the Ninth Circuit's observations regarding the deference that an appellate court must give to the district court's factual determination when ruling on the credibility of a prosecutor's strike based on a juror's difficulty in communicating:

> The trial judge is in a unique position to determine whether a witness has difficulty communicating, and therefore we grant a high level of deference to the district court's finding on this point. It is difficult to ascertain from a transcript the level of a juror's command of spoken English. . . . How slowly she spoke, whether she hesitated, how thick her accent was, and what her body language revealed are not recorded in a transcript, yet these are aspects of communication that may be considered by the trial judge.

Id. In this case, giving due deference to the district court's opportunity to hear and observe both the prosecutor and De La O, we cannot conclude that the district court clearly erred in finding that the Government's reasons for peremptorily striking of De La O were not pretextual. The Government did not strike De La O because he had a Spanish accent. Instead, the strike was based on the prosecutors' asserted belief that his heavy accent would cause communication difficulties with other jurors during deliberations. This reason is ethnically-neutral. The district court observed the prosecutor's demeanor. It listened to De La O during voir dire. It was therefore in the best position to determine the credibility of the prosecutor's explanation and to make the ultimate finding as

7

to whether the prosecutor's reasons for striking De La O were pretextual.[4]  We will not disturb its ruling.

B

Severance

Ortegon, Carrion, Michael Perez, and Morales argue that the district court erred by denying their motions for severance.  They maintain that they were prejudiced by the spillover effect of the evidence of their co-defendants' violent crimes (especially the "French Place" murders, described as one of the worst mass murders in recent San Antonio history) and drug dealing.  Furthermore, they argue, the district court's instructions to the jury to consider the evidence against each defendant separately were inadequate to ameliorate the prejudice.

The Government responds that the alleged prejudicial evidence would have also been admissible in separate trials to show the existence of the enterprise, overt acts, motives for the murders with which they were involved, and the position of trust they held in the organization.  The Government also notes that the district court allowed the jurors to take notes to assist them in keeping the evidence against each defendant separate.  Furthermore, the

---

[4]We find no abuse of discretion by the district court in refusing to permit Appellants' counsel to cross-examine the prosecutor or look at the prosecutor's voir dire notes. See United States v. Clemons, 941 F.2d 321, 323 (5th Cir. 1991) (district court has discretion to formulate procedure for testing prosecutor's reasons, and has discretion to limit scope and duration of inquiry).

Government points out that defense counsel argued in closing that the jury should consider the evidence against each defendant separately.

We find no abuse of discretion. Appellants have not shown any ground for disregarding the presumption that the jurors followed the district court's instructions to consider the evidence against each defendant separately. See United States v. Cihak, 137 F.3d 252, 259 (5th Cir. 1998) (jury is presumed able to follow instructions to consider evidence against each defendant separately).

C

Transfer of Venue

Appellants argue that the district court abused its discretion by denying defense motions for transfer of venue and a hearing on their motions. They maintain that they were denied a fair trial in San Antonio because of pervasive, prejudicial pretrial publicity. In support of their motions, they presented 69 broadcast summaries from San Antonio television stations, newspaper articles, and a transcript from a state court venue proceeding, including expert testimony about the saturation of media coverage. They note that the publicity occurred within close proximity to the trial; that it contained inflammatory accounts of the crimes, characterizing the defendants as blood-thirsty and describing the French Place murders as a slaughter, bloodbath, execution, and the worst mass murder in recent San Antonio history; and that it included matters

9

inadmissible in evidence, such as the anticipated sentences, the guilty pleas of co-defendants, and the statement by one defense attorney that the other defendants were probably guilty.

Prejudice will be presumed if the defendant establishes that it is virtually impossible to obtain an impartial jury because prejudicial, inflammatory publicity about the case has saturated the community from which the jury is drawn. United States v. Parker, 877 F.2d 327, 330-31 (5th Cir. 1989). The Government may rebut the presumption of prejudice by demonstrating that voir dire resulted in the impaneling of an impartial jury. Id. at 331. Alternatively, a defendant may obtain relief if he establishes that pretrial publicity created a significant possibility of prejudice and that the voir dire procedure failed to provide a reasonable assurance that prejudice would be discovered. United States v. Beckner, 69 F.3d 1290, 1292 (5th Cir. 1995). The defendant is entitled to an evidentiary hearing when the allegations are "sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that a substantial claim is presented." United States v. Smith-Bowman, 76 F.3d 634, 637 (5th Cir. 1996) (internal quotation marks and citation omitted).

Appellants argue that they have established presumptive prejudice. Alternatively, they contend that they demonstrated a significant possibility of prejudice. They note that 85 percent of the prospective jurors admitted that they had been exposed to pretrial publicity; a majority of those had heard about the trial

10

and the French Place murders within the week preceding the trial; and 11 of the 12 jurors selected said that they had been exposed to pretrial publicity concerning the trial, the Mexican Mafia, and the French Place murders. As proof of the inadequacy of the voir dire procedure, they observe that the court did not allow questioning by counsel or the use of a jury questionnaire. They also point out that, prior to the jury being sworn, one of the jurors who had been selected approached the district court and said that she could not be fair because she had been influenced negatively by pretrial publicity. (She was excused.)

Although the question may be close, we conclude that there was no abuse of discretion. Even assuming that Appellants established presumptive prejudice, the presumption was rebutted by the selection of a fair jury. The district court first questioned the venire as a group, and excused those who said that they might be affected by pretrial publicity. It then questioned each remaining veniremember individually, excusing for cause all who indicated that they might have been affected. All of the jurors selected indicated that they had not been affected by the publicity; and all jurors stated that they would accord the presumption of innocence to all of the defendants. Contrary to the Appellants' argument, that one of the jurors approached the district court and said that she could not be fair demonstrates the effectiveness of the voir dire procedure in revealing prejudice.

D

11

## Admission of Testimony About Gangs

Appellants argue that their convictions must be reversed because the district court admitted gang expert testimony that did not satisfy the requirements of <u>Daubert</u>. They argue that the expert was unable to point to any peer-reviewed articles or other literature in the field and had no formal education in gang-related activities. The Government asks us to strike this argument because Appellants do not specify what testimony they believe was admitted in error or how it prejudiced them. The Government notes that the witness, a San Antonio Police Department detective with 31 years of experience, testified on a variety of subjects, including the activities and purposes of the Mexican Mafia, and he offered a translation of correspondence between Mexican Mafia members about Mexican Mafia activities. The Government did not offer the witness as an expert, and it argues that most of his testimony was factual and dealt with information he had learned in his capacity as a law enforcement officer. To the extent he expressed any opinions, the Government argues that they are admissible as lay opinions under Federal Rule of Evidence 701, because they are based on personal knowledge of the facts. Alternatively, the Government argues that any error is harmless because the witness would have qualified as an expert witness under Federal Rule of Evidence 702 and, in any event, his testimony was cumulative.

We find no abuse of discretion by the district court. Even assuming this issue was adequately briefed (which is marginal), and

12

further assuming that the testimony was admitted erroneously, Appellants have not demonstrated that their substantial rights were affected. See FED. R. EVID. 103(a).

E

Jury Instructions

Appellants argue that the district court erred by instructing the jury that the Government need only show a minimal effect on interstate commerce. They maintain that the Government was required to demonstrate that their activities had a substantial effect on interstate commerce. The Government notes that none of the Appellants objected to the instruction, none of them submitted proposed instructions requiring the jury to find a substantial effect on interstate commerce, and two of them (Remigio Gomez and Robert Perez) proposed instructions requiring only a minimal effect and thus invited the error of which they complain. See United States v. Baytank (Houston), Inc., 934 F.2d 599, 606-07 (5th Cir. 1991). The Government contends that even if there was an error, it was not plain and, in any event, it was harmless because the evidence shows a substantial effect on interstate commerce.

Five circuits have held that it is not necessary to show that a RICO enterprise's effect on interstate commerce is substantial.[5]

---

[5]United States v. Marino, 277 F.3d 11, 34-35 (1st Cir.) (rejecting contention that government was required to show that enterprise's activity had a substantial effect on interstate commerce and approving instruction that "[t]he evidence need not show any particular degree of or effect on interstate commerce. All that is required is some effect on interstate commerce."),

13

Neither the Supreme Court nor our court has decided this issue. See United States v. Robertson, 514 U.S. 669, 670-72 (1995) (leaving open question whether RICO enterprise's activities must "substantially affect" interstate commerce where enterprise was engaged in commerce).  Under the circumstances of this case, we need not decide whether the instruction was erroneous, because even assuming that it was, any error would not be plain given the unsettled state of the law both in the Supreme Court and in this circuit, and the overwhelming evidence of drug trafficking involved in this RICO enterprise.  Accordingly, we hold that the district court did not commit plain error by instructing the jury that the Government need prove only a minimal effect on interstate commerce.

F

Sufficiency of the Evidence

---

cert. denied, 122 S.Ct. 2639 (2002); United States v. Riddle, 249 F.3d 529, 537 (6th Cir.) ("de minimis connection suffices for a RICO enterprise that 'affects' interstate commerce"), cert. denied, 122 S.Ct. 292 (2001); United States v. Juvenile Male, 118 F.3d 1344, 1348 (9th Cir. 1997) ("all that is required to establish federal jurisdiction in a RICO prosecution is a showing that the individual predicate racketeering acts have a de minimis impact on interstate commerce"); United States v. Miller, 116 F.3d 641, 673-74 (2d Cir. 1997) (approving instructions in RICO case that effect of enterprise's activities on interstate commerce does not need to be substantial and that a minimal effect is sufficient); United States v. White, 116 F.3d 903, 926 & n.8 (D.C. Cir. 1997) (approving instruction that "evidence need not show any particular degree of effect on interstate commerce" and explaining that, because RICO enterprise was engaged in drug trafficking, there was a substantial effect on or relation to commerce; therefore, fact that district court did not require jury to find that conspiracy affected interstate commerce to any particular degree was irrelevant).

Appellants contend that the Government presented insufficient evidence that they participated in a pattern of racketeering activity and conspired to do so, and to prove venue and the requisite effect on interstate commerce. We address each of these contentions separately. We note at the outset, however, that Appellants' insufficient evidence arguments are based largely on challenges to the credibility of Mexican Mafia members who testified against them. They argue that the testimony of admitted psychotic, hallucinogenic, and drug-addicted co-defendants (Estrada, Carrasco, and Torres) who were seeking entry into the federal witness protection program was not credible. We reject these challenges to the credibility of the Government's witnesses. "It is well settled that credibility determinations are the sole province of the jury." United States v. Cathey, 25 F.3d 365, 368 (5th Cir. 2001). "The jury has responsibility for determining the weight and credibility of testimony and evidence, even from co-conspirators." United States v. Green, 293 F.3d 886, 895 (5th Cir. 2002).

1

## Pattern of Racketeering Activity

Appellants argue that the evidence is insufficient to prove that they engaged in a pattern of racketeering activity, because the evidence of the predicate racketeering acts is insufficient. We consider each challenged predicate act separately.

a

15

<u>Ortegon:  Possession with Intent to Distribute Cocaine</u>

We reject Ortegon's contention that the evidence was insufficient to prove that he possessed cocaine with the intent to distribute it.  A bag full of cocaine, as well as plastic bags used to package cocaine, were found in a car driven by Herrera, under the passenger seat occupied by Ortegon, who had a fully loaded revolver tucked in his waistband.  Ortegon argues that the evidence was insufficient to prove that he knew the cocaine was under his seat.  He notes that Herrera pleaded guilty to possession of the cocaine in state court, while the charges against him were dismissed.  In the light of other evidence that Ortegon was a drug dealer and a gang leader, the jury reasonably could have concluded that Ortegon knew the cocaine was present and was armed to protect it.

b

<u>Ortegon:  Murder of Peralez</u>

Ortegon also argues that the evidence was insufficient to prove his involvement in the murder of Peralez.  Former Mexican Mafia member Estrada testified that Appellant Herrera ordered him and Ortegon to murder Peralez; and that, on a signal from Herrera, he (Estrada) shot Peralez, but Ortegon did not fire his weapon.  Ortegon argues that Estrada's testimony is not credible.  We conclude that the evidence was sufficient to find Ortegon guilty of murder under the law of the parties, on which the jury was instructed.  Estrada's admission that he was the only one who shot

16

Peralez lends credibility to his testimony that Ortegon was with him.  In any event, such credibility determinations are for the jury, not this court, to make.

c

<u>Ortegon and Michael Perez:  Murder of Adames</u>

Ortegon and Michael Perez contest the sufficiency of the evidence offered by the Government to prove that they were guilty of the murder of Adames.

Estrada testified:  Michael Perez and Ortegon were present at a meeting at Robert Perez's house during which the murder of Adames was planned; Michael Perez drove the car to the scene and blocked Adames's means of escape; Ortegon got out of the car with a gun; Estrada shot Adames and heard a lot of other gunshots; and after the shooting, Michael Perez drove the shooters to a truck, where they unloaded their weapons.  Carrasco, who was also present, testified that everyone (Herrera, Ortegon, Estrada and himself) except Michael Perez got out of the car and shot at Adames.  The medical examiner found that Adames had been shot 11 times with three different weapons.  Ortegon and Michael Perez argue that Carrasco and Estrada were not credible witnesses, inasmuch as they were drug addicts testifying in exchange for leniency.  In addition, Michael Perez relies on defense witness Sanchez's testimony that Michael Valdez, not Michael Perez, was the driver of the car involved in the Adames murder.  He also notes that the Government substituted his name for that of Michael Valdez in a

17

search warrant only after he refused to cooperate against his uncle (Appellant Robert Perez).

We conclude that the evidence was sufficient to convict Ortegon and Michael Perez under the law of the parties, as to which the jury was instructed. We repeat: Decisions about the credibility of witnesses are for the jury.

d

### Ortegon and Michael Perez: Murder of Ybarra

Ortegon and Michael Perez also challenge the sufficiency of the evidence that they murdered Ybarra. They assert that Estrada's and Carrasco's testimony that Ortegon shot Ybarra, and that Michael Perez drove the car to and from the murder scene, is not credible.

The jury was entitled to determine the credibility of Estrada's and Carrasco's testimony. In addition to their testimony, the Government presented other corroborating evidence, including the in-court identification of Ortegon as the shooter by eyewitness Marco Gonzalez. The Government also presented evidence that Michael Perez was present at the meeting when the murder was planned; that he drove the vehicle to the scene of the murder; and that, after the shooting, he drove the shooters to a truck, where they unloaded their weapons.

e

### Carrion and Morales: Possession with Intent to Distribute Marijuana

18

Carrion and Morales argue that the evidence was insufficient to prove that they possessed marijuana with the intent to distribute it. Former Mexican Mafia member Jesse Torres testified: he saw 50 pounds of marijuana at Morales's mother's home; Morales, Carrion, and Escalante had been told by Robert Perez to steal the marijuana from someone; after they stole the marijuana, someone else called Robert Perez to have him come pick it up; when Robert Perez arrived at Morales's mother's house, Morales, Carrion, and Escalante were weighing and dividing it; Robert Perez gave each of them a pound and then sold the rest to someone in Houston. Carrion and Morales argue that this evidence is insufficient because Torres was a liar and heroin addict and thus his testimony was not credible. We reject that contention. It was up to the jury whether to believe Torres's testimony.

f

### Carrion and Morales:  Murder of De Los Santos

Carrion and Morales challenge the sufficiency of the evidence offered to prove their participation in the murder of De Los Santos.

Munoz testified:  he instructed Flores to have his crew kill De Los Santos because he was talking to outsiders about the French Place murders; Munoz drove De Los Santos to a bar under the guise of having him assist Morales and Carrion with a hijacking; Carrion's rental car was parked outside the bar and Morales and Carrion were inside; he left the bar five-ten minutes later,

19

leaving De Los Santos with Morales and Carrion; later, Flores told him that De Los Santos was dead. Munoz admitted that he did not see De Los Santos murdered and did not know who had killed him.

Although Munoz testified that he did not see Torres at the bar, Torres testified that he was there, along with Davila and Flores, when Munoz and De Los Santos arrived. Torres testified further that Flores later told him De Los Santos had been killed; and that he later heard Morales bragging about the murder and laughing about how he had choked De Los Santos. The medical examiner testified that the cause of death was most likely a combination of blunt injuries to the head and strangulation, although the injuries that appeared to be caused by strangulation could have been caused by blunt trauma from being hit by a vehicle. The manager of the rental car agency testified that, when Carrion's rental car was returned, there were no signs of damage consistent with it having hit a person.

Morales and Carrion argue that there is no physical evidence to connect them to the murder; no one saw De Los Santos murdered; and both Munoz and Torres testified that they did not know who killed De Los Santos. Morales notes that Carrion testified at trial that Morales did not kill De Los Santos. For the first time in his reply brief, Morales states that, after trial, Carrion obtained an affidavit in which co-defendant Pena admitted murdering De Los Santos.

Although circumstantial, the evidence was sufficient. Appellants' challenges are based primarily on their contention that the testimony of Munoz and Torres was not credible. We refuse to consider Morales' claim that Pena murdered De Los Santos, raised for the first time in his reply brief. See United States v. Garcia-Abrego, 141 F.3d 142, 168 n.14 (5th Cir. 1998).

g

Johns:  Attempted Murder of Castillo

Johns contends that the evidence is insufficient to prove that he attempted to murder Castillo.  Johns and Castillo were cellmates.  Castillo was a member of a different, rival gang. While Castillo was sleeping, Johns stabbed him 22 times in the head and neck with a shank that had a two and one-half inch blade. Castillo fought back and held onto Johns' legs until prison guards arrived.  As Castillo held Johns down, Johns said, "If you let me go, ----, I'll stab you again."  In a search of the cell after the incident, guards found a torn-up note in the toilet that included the instruction to "hit to kill."  Johns argues that the evidence is insufficient to convict him of attempted murder because the evidence does not prove that he intended to kill Castillo or that he inflicted serious bodily injury on Castillo.  He notes that Castillo was able to walk to the infirmary, that none of his stab wounds required sutures, and that there was no evidence that Castillo was in danger of death from his wounds.  Johns admits that he used a deadly weapon, and that specific intent to kill may be

21

inferred from such use; but he claims that the manner in which he used the weapon makes it reasonably apparent that he did not intend to cause death or serious bodily injury.

We conclude that the evidence is sufficient to prove that Johns attempted to murder Castillo. The fact that Castillo's struggle prevented Johns from inflicting a fatal wound does not preclude the jury from inferring, based on all of the circumstances, that Johns acted with specific intent to kill. The Government was not required to prove that Johns caused serious bodily injury because that is not an element of attempted murder.

h

### Michael Perez: Association with Enterprise and Participation in Its Affairs

Michael Perez argues that the evidence is insufficient to prove that he associated with the enterprise and participated in its affairs. He contends that the Government failed to prove that he was a member of the Mexican Mafia; instead, it showed only a familial relationship with his uncle, Appellant Robert Perez. He argues that there is no evidence that he was employed by or associated with the enterprise or that he intentionally participated in its affairs. Although there was testimony that he was present at meetings at which murders were discussed, and that he drove the murderers to and from the scenes of at least two of the murders, he argues that there is no evidence that he

22

participated in the meetings or that he was there for any other reason than that he is the nephew of Robert Perez.

We conclude that the evidence is sufficient. Carrasco and Estrada both testified that Michael Perez was a member of the Mexican Mafia. The Government also introduced a photograph of Michael Perez with Mexican Mafia members Herrera, Ortegon, and Carrasco. There was also evidence that he helped clean bullets used in the murders. The jury was entitled to infer that he would not have been allowed to be present at murder-planning meetings and to drive the shooters to and from the scenes of the murders unless he was a member of the Mexican Mafia.

i

### Remigio Gomez: Attempted Murder of Grant

Remigio Gomez contends that the evidence is insufficient to prove that he attempted to murder Grant. Mexican Mafia member Tavitas testified that Remigio Gomez shot Grant during a hijacking conducted by a crew led by Appellant Jesse Gomez. Another Mexican Mafia member, Munoz, testified that Jesse Gomez told him that Remigio Gomez shot Grant. Remigio Gomez argues that this evidence is insufficient to prove that he committed attempted murder. He argues that Texas law requires the prosecution to prove that the act was intentional rather than an accident; yet the Government has conceded that he panicked when he shot Grant. He claims that Grant's appearance surprised him, and that he panicked and accidentally discharged the shotgun in Grant's direction when Grant

23

reached out to push the weapon away. He concedes, however, that at trial he presented an identity defense and did not argue that the shooting was an accident. The Government notes that there is no evidence that Grant touched the shotgun or attempted to push it away. It also notes that the photograph of Grant's wounds does not support the theory that the gun accidentally discharged; instead, it appears that Grant had been pushed down onto his knees and then shot.

We conclude that the evidence is sufficient. As the Government notes, the fact that Remigio Gomez panicked is not relevant to the issue of his intent, and the jury reasonably could have concluded that he intended to kill Grant when he pointed the shotgun at him and pulled the trigger.

2

Racketeering Conspiracy

Appellants' challenges to the sufficiency of evidence of conspiracy are, again, based primarily on their attacks on the credibility of the Government's witnesses. In addition, some of them argue that the Government failed to prove each overt act alleged in the indictment. Finally, some of them argue that their participation in the various overt and predicate racketeering acts is insufficient to prove that they knew of and agreed to the overall objectives of the enterprise.

We conclude that the evidence is sufficient. As stated, credibility choices are for the jury. The Government was not

24

required to prove each overt act alleged in support of the racketeering conspiracy. See 18 U.S.C. § 1962(d); Salinas v. United States, 522 U.S. 52, 62 (1997) (RICO conspiracy statute, 18 U.S.C. § 1962(d), does not require proof of overt act). There is sufficient evidence to show that each Appellant participated in at least some of the predicate and overt acts. This evidence, together with their membership in the Mexican Mafia, whose written constitution describes the illegal purposes and objectives of the organization, is indeed evidence that they knew of and agreed to the overall objectives of the enterprise.

3

Effect on Interstate Commerce

Appellants contend that the Government presented insufficient evidence that the activities of the enterprise had a substantial effect on interstate commerce. Alternatively, they argue that, even if only a minimal effect on interstate commerce is required, the Government failed to prove any effect. They argue that all of the alleged criminal acts took place in and around San Antonio, and that the evidence of interstate communication (written and telephonic) was, at best, incidental to the operation of the enterprise.[6]

---

[6]As we have earlier noted, Appellants did not object to the jury instructions, which required the jury to find only a minimal effect on interstate commerce. In cases in which the Government fails to object to jury instructions, we have held that the unobjected-to instructions, even if erroneous, become the law of the case, and we have judged the sufficiency of the evidence in

The Government responds that, although only a minimal effect is required, it proved that the activities of the enterprise had a substantial effect on interstate commerce. The Government relies on the following evidence:  The Mexican Mafia engaged in drug trafficking and extorted a ten percent "tax" from drug dealers. Those who did not pay the tax were robbed or murdered. The money and property collected and stolen were used to finance the purchase of money orders that were mailed to Mexican Mafia members, many of whom were in prison, some in states outside of Texas. A letter from a Mexican Mafia member to Appellant Robert Perez referred to the availability of pure, uncut cocaine from Colombia. Mexican

accordance with the law established in the jury instructions. See United States v. Spletzer, 535 F.2d 950, 954 (5th Cir. 1976) (element of specific intent became law of the case where defendant was indicted for "knowingly, wilfully and unlawfully escaping" and court instructed jury, without objection, that specific intent was required for conviction; therefore, court did not need to decide whether specific intent was an element of the offense; conviction reversed because Government failed to present sufficient evidence of specific intent); United States v. Taylor, 933 F.2d 307, 310 (5th Cir. 1991) (although statute did not require proof of specific intent, it became an element under law of the case doctrine when defendant was indicted for willfully escaping federal custody and government failed to object when court instructed jury that specific intent was an element; evidence was sufficient to prove specific intent).

We have not found any cases applying this principle in cases in which the defendant fails to object to a jury instruction and then challenges the sufficiency of the evidence on a ground that is not consistent with the jury instructions. Were we to apply the principle established in those cases in this case, evidence that the enterprise's activities had a minimal effect on interstate commerce would be sufficient. We do not reach that question, however, in the light of our conclusion that the Government presented evidence sufficient to establish that the enterprise's activities had a substantial effect on interstate commerce.

26

Mafia business was conducted by mail, including through letters from Mexican Mafia president Huerta, who was in prison in Kansas and then in Colorado, that were mailed to Texas. Mexican Mafia members used telephones and pagers to communicate Mafia business, and some of the telephone calls were placed from Texas to Mexican Mafia members in out-of-state prisons. Membership in the Mexican Mafia was not limited to Texas residents or Texas prisoners; some members were from California.

As we have previously noted, neither the Supreme Court nor our court has decided whether a RICO enterprise's activities must "substantially" affect interstate or foreign commerce, or whether proof of a minimal effect is sufficient. It is not necessary for us to decide that issue in this case because the Government presented evidence that the activities of the Mexican Mafia satisfy the interstate commerce requirement for constitutionality of the act.

At the outset, we note that Congress has made persuasive findings that organized crime and drug trafficking, both of which are activities in which the Mexican Mafia was engaged, have a substantial effect on interstate commerce. In enacting RICO, Congress made the following findings regarding the effect of organized crime on interstate commerce:

> . . . organized crime in the United States
> annually drains billions of dollars from
> America's economy by unlawful conduct and the
> illegal use of force, fraud, and corruption; .
> . . organized crime activities in the United

27

States weaken the stability of the Nation's economic system, . . . [and] seriously burden interstate and foreign commerce.

Congressional Statement and Findings of Purpose, Organized Crime Control Act, Pub. L. No. 91-452, 84 Stat. 922, 922-23 (1970).

Congress has also found that drug trafficking substantially affects interstate commerce:

(3) A major portion of the traffic in controlled substances flows through interstate and foreign commerce. Incidents of the traffic which are not an integral part of the interstate or foreign flow, such as manufacture, local distribution, and possession, nonetheless have a substantial and direct effect upon interstate commerce because--

(A) after manufacture, many controlled substances are transported in interstate commerce,

(B) controlled substances distributed locally usually have been transported in interstate commerce immediately before their distribution, and

(C) controlled substances possessed commonly flow through interstate commerce immediately prior to such possession.

(4) Local distribution and possession of controlled substances contribute to swelling the interstate traffic in such substances.

(5) Controlled substances manufactured and distributed intrastate cannot be differentiated from controlled substances manufactured and distributed interstate. Thus, it is not feasible to distinguish, in terms of controls, between controlled substances manufactured and distributed interstate and controlled substances manufactured and distributed intrastate.

> (6) Federal control of the intrastate incidents of the traffic in controlled substances is essential to the effective control of the interstate incidents of such traffic.

21 U.S.C. §§ 801(3)-(6). See United States v. Lopez, 2 F.3d 1342, 1366 n.50 (5th Cir. 1993) (noting "the now unchallenged federal authority over intrastate as well as interstate narcotics trafficking," and observing that "all drug trafficking, intrastate as well as interstate, has been held properly subject to federal regulation on the basis of detailed Congressional findings that such was necessary to regulate interstate trafficking"), aff'd, 514 U.S. 549 (1995); see also White, 116 F.3d at 926 & n.8 (substantial effect on interstate commerce established where RICO enterprise was engaged in drug trafficking).

The activities of the Mexican Mafia -- narcotics trafficking, extortion from individuals engaged in narcotics trafficking, and committing other organized crime, including murders, to extort money and avoid detection -- clearly are among the kinds of activities that Congress has found to have a substantial effect on interstate commerce. The record contains overwhelming evidence that the Mexican Mafia engaged in drug trafficking, as well as extortion from drug dealers. The murders alleged as predicate acts were closely related to the enterprise's drug trafficking and extortion activities. There is evidence that at least some of the illegal drugs were obtained from sources outside the State of Texas. Instrumentalities of interstate commerce were used to

29

conduct the business of the Mexican Mafia, and some of that business was conducted across state lines. Thus, the evidence presented in this case is sufficient to establish the interstate commerce element of the RICO charges.

4

Venue

Appellants argue that the Government failed to prove that any of the acts took place in the Western District of Texas, as alleged in the indictment. They do not argue that venue was improper.

In denying motions for acquittal on this ground, the district court, relying on maps of the areas where various acts took place, and noting that many of the acts occurred within the city limits of San Antonio, took judicial notice of the fact that San Antonio is in the Western District of Texas. Appellants argue that the evidence was insufficient for the court to take judicial notice of venue. We disagree. The evidence showed that San Antonio was the headquarters of the Mexican Mafia and the area in which it operated. As Appellants acknowledge, most of the predicate acts took place in San Antonio. In the light of this evidence, as well as the maps of the area that were admitted into evidence, the district court did not err by taking judicial notice of the fact that San Antonio is in the Western District of Texas.

G

Brady, Giglio, and Jencks

Appellants argue that their convictions must be reversed because of violations of <u>Brady</u>, <u>Giglio</u>, and the Jencks Act.[7] They contend that the Government violated due process and the Jencks Act by failing timely to provide to the defense the following items: (a) letters drafted by or on behalf of Government witness Estrada; (b) Estrada's immunity agreement; (c) papers signed by Estrada; (d) a written statement provided to police by Frank Rios; (e) a written statement provided to police by Mario Sanchez; and (f) a report written by Detective Bellamy. They contend that they were prejudiced because the failure timely to provide these documents prevented defense counsel from conducting effective cross-examination. We address each item in turn.

1

<u>Estrada Letters</u>

Estrada sent FBI Agent Appleby three letters, the first of which was lost. Agent Appleby testified that the first letter was written for Estrada by another inmate. In it, Estrada offered to cooperate by providing information about the Mexican Mafia. He also related a threat that the Mexican Mafia had made against his life. The second letter listed homicides about which Estrada had information. Both this second and the third letters were provided to defense counsel during trial. After the letters were provided,

---

[7]Although Appellants also refer to violations of <u>Brady</u> and <u>Giglio</u>, their arguments focus primarily on alleged Jencks Act violations.

defense counsel were allowed to question Agent Appleby about them. The district court denied defense motions to strike Estrada's testimony. Estrada then was recalled to the stand and defense counsel were allowed to further cross-examine him. The Government concedes that there is no good-faith exception to the Jencks Act, but argues that the district court, in refusing to strike Estrada's testimony, implicitly found that the first letter, which was lost, was not material or important to the defense.

Appellants have not demonstrated that they were harmed by the delay in producing the second and third letters, because they were allowed to cross-examine Agent Appleby and Estrada after receiving them. The district court did not err by refusing to strike Estrada's testimony because of the failure to produce the first letter, because Agent Appleby's testimony about that letter shows that it was not material to the defense. In any event, even if there was error, it was harmless.

2

Estrada Immunity Agreement

The Government asserts that, although it is clear that Estrada was granted immunity (he testified about it), there is no evidence of the existence of a written immunity agreement. Even assuming such an agreement exists, it is not a statement of a witness and thus is not covered by Jencks. In the light of Estrada's testimony about his grant of immunity, Appellants were not prejudiced by the failure to produce a written agreement (assuming it exists).

32

## Papers Signed by Estrada

Estrada testified that he had signed some papers when he met with Agent Appleby, but he did not know the contents of the papers because he does not read or write. At a Jencks hearing, Agent Appleby testified that he never had Estrada sign any statements. The Government notes that Appellants did not ask the district court to make a ruling after the Agent's testimony. Appellants have failed to demonstrate that the papers existed or that, if they exist, they are statements covered by the Jencks Act or that they were material to the defense.

## 4

## Rios Statement

Government witness Rios testified that he had given a written statement to a detective when he was arrested on a motion to revoke his probation, but that the statement did not address the matters covered in his testimony at Appellants' trial. Pena's counsel acknowledged receipt of the statement after Rios had testified. The only Appellant who asked to have Rios re-called was Johns, who has not raised this issue on appeal. The Government asserts that this issue was not preserved for appeal because defense counsel failed to submit a copy of the statement for the record.

Even assuming the issue was preserved, there is no showing that Appellants were prejudiced by the delay in receiving the

statement.  The statement is not covered by the Jencks Act, because it is not related to the subject matter of Rios's testimony.

5

## Sanchez Statement

Mario Sanchez was a defense witness called by Michael Perez. During cross-examination, the Government referred to his sworn statement, and defense counsel claimed they had not received it. Although the Government stated that it had provided a copy along with the police report, the district court ruled that the Government could not use the statement for impeachment and ordered the Government to provide it to defense counsel.  The Government did so the next day.  The only Appellant who asked to re-call the witness was Johns, who does not raise this issue on appeal.

The Jencks Act does not cover statements of defense witnesses. Appellants do not allege, nor did they obtain a ruling, that the statement contains material exculpatory information.  In any event, Appellants do not assert that the delay in receiving the document prejudiced them.

6

## Detective Bellamy's Notes

The Government provided defense counsel with four or five pages of Detective Bellamy's notes, with some deletions. Appellants sought the entire document.  Because it named informants, the Government asked the district court to review it in camera to determine whether it contained impeachment or exculpatory

34

information.  The district court denied defense counsel's request for the entire document, explaining that it was not Jencks material because Bellamy was not a witness, and that it did not contain any Brady or Giglio material.  We find no error by the district court in this ruling.

H

General Verdict Form

Appellants contend that, in this complex criminal RICO trial involving multiple defendants, dozens of alleged predicate acts, and considerable opportunity for juror confusion and disagreement, the district court violated their due process rights by submitting a general verdict form, which asked only whether each of the defendants was guilty of the crimes charged in counts 1 and 2 of the indictment.  The Appellants concede that the district court instructed the jurors that they must reach a unanimous verdict as to each racketeering act alleged to have been committed by each defendant.  They argue, however, that the general verdict form did not adequately ensure that the jury recognize that it must unanimously agree as to each defendant's involvement in the same two or more specific predicate racketeering acts.  They contend that a special verdict form was required by due process as a safeguard to ensure that the jury followed the court's instructions.  Some of the Appellants also argue that a special verdict form was necessary for the conspiracy count so that the jury could specify which overt acts each defendant had committed.

35

The Government responds that special verdicts traditionally have been disfavored in criminal cases, and that the use of a general verdict form did not result in due process violations at sentencing.

We find no abuse of discretion or due process violation in the use of a general verdict form in this case. The district court instructed the jury that, to convict on the substantive count, it had to agree unanimously that each defendant committed at least two predicate acts, and that it must unanimously agree as to which two or more specific predicate acts each defendant committed. It further instructed the jury that it was not sufficient that some of the jurors find that the defendant under consideration committed two of the acts, while other jurors find that the defendant committed different acts.

The record here indicates that the district court's instructions were clear, and that Appellants were not prejudiced by the use of a general verdict form. Appellants have offered no basis for disregarding the presumption that the jury followed its instructions. Because commission of an overt act is not an element of RICO conspiracy, see Salinas, 522 U.S. at 62, the district court did not abuse its discretion by not submitting a special verdict requiring the jury to designate the overt acts committed by each defendant.

I

Apprendi

36

Appellants argue that their sentences were imposed in violation of Apprendi (decided a year after they were sentenced), because the district court enhanced their sentences to life imprisonment, in excess of the statutory maximum 20-year term, on the basis of facts (murder, attempted murder, and aggravated robbery) not alleged in the indictment, presented to the jury, and found by the jury beyond a reasonable doubt. Appellants contend that, because they were charged with more racketeering acts than the two necessary for conviction, some of which are not punishable by life imprisonment, the general verdict form makes it impossible to tell whether the jury found them guilty of predicate acts punishable by life imprisonment. Some of the Appellants argue that the district court committed Apprendi error by failing to submit to the jury the drug quantity element of the predicate acts involving marijuana and cocaine. Some of them also argue that the district court did not instruct the jury on the elements of the predicate racketeering acts.

There is no Apprendi indictment error, because the indictment alleged the facts of the racketeering acts that were the basis of the enhanced sentences. There is no Apprendi instructional error, because the district court instructed the jury on the elements of each of the predicate racketeering acts and instructed that the jury's verdict must be unanimous as to each of the two or more specific racketeering acts alleged to have been committed by each defendant. Because there were no sentence enhancements based on

37

the drug racketeering acts, the district court did not violate Apprendi by failing to submit the drug quantity element to the jury. Finally, the district court did not err by failing to instruct the jury as to overt acts, because proof of overt acts is not necessary for a RICO conspiracy conviction. See Salinas, 522 U.S. at 62. There was no Apprendi sentencing error, because the jury necessarily found that each Appellant committed at least one predicate act punishable by life imprisonment, as explained below for each Appellant.

Appellant Carrion was charged with three racketeering acts: possession with intent to distribute marijuana and two murders. Because the jury found him guilty of racketeering, which requires finding that he committed at least two racketeering acts, the jury necessarily found that he committed at least one murder, which is punishable by life imprisonment.

Ortegon was charged with four racketeering acts: possession with intent to distribute cocaine and three murders. Thus, the jury necessarily found that he committed at least one murder, which is punishable by life imprisonment.

Morales was charged with only two racketeering acts, one of which was murder. Thus, the jury necessarily found that he committed murder, which is punishable by life imprisonment.

Jesse Gomez was charged with seven racketeering acts, one of which was robbery and the remainder of which were murders. Thus,

the jury necessarily found that he committed at least one murder, which is punishable by life imprisonment.

Because Remigio Gomez was charged with only two racketeering acts (attempted murder and aggravated robbery), the jury necessarily found that he committed both. Aggravated robbery is punishable by life imprisonment.

Because Michael Perez was charged with only two racketeering acts (both murders punishable by life imprisonment), the jury necessarily found that he committed both.

Herrera was charged with seven racketeering acts: five murders, one attempted murder, and possession with intent to distribute cocaine. Because Herrera had prior felony convictions, the attempted murder is punishable by life imprisonment. Thus, the jury necessarily found that he committed at least one predicate act punishable by life imprisonment.

Because Johns was charged with only two racketeering acts, one of which was aggravated robbery, the jury necessarily found that he committed at least one act punishable by life imprisonment.

Robert Perez was charged with eight racketeering acts: six murders, one attempted murder (punishable by life imprisonment because he has a prior felony conviction), and possession with intent to distribute marijuana. Thus, the jury necessarily found that he committed at least one act punishable by life imprisonment.

39

Because Pena was charged with only two racketeering acts (murder and aggravated robbery), the jury necessarily found that he committed an act punishable by life imprisonment.

J

## Ortegon:  Denial of Motion for New Trial

Ortegon argues that the district court abused its discretion by denying him a hearing on his motion for new trial.  He sought a new trial on the grounds that the verdict was against the weight of the evidence, newly discovered evidence, and perjured testimony. He argues that the district court erred by failing to make findings of fact independently weighing the evidence and assessing credibility.  His argument regarding newly-discovered evidence pertains to the Estrada letters that are the subject of the Jencks Act claim discussed above.  He claims that the lost Estrada letter was written by Ramos and that, by the time the defense was put on notice of the lost letter, it was too late to secure Ramos as a witness and, in any event, neither the defense nor the prosecution knew Ramos's whereabouts.  He maintains that the testimony of Ramos about the contents of the letter would have been material to his guilt, but he does not indicate what Ramos's testimony would have been.  He claims that Estrada committed perjury by testifying that the murder of Emilio Alejandro was ordered by the Mexican Mafia. He bases this claim on Carrasco's knowledge that Estrada killed Alejandro because of a personal vendetta.  He also claims that his girlfriend, Loera, committed perjury when she testified that he had

40

used heroin at her house.  Finally, he asserts that the district court should have conducted an evidentiary hearing on his motion. The Government observes that the motion referred to an affidavit of Loera offered to prove that she had committed perjury, but the affidavit was not attached and is not in the record.

We find no abuse of discretion.  The verdict was not against the weight of the evidence.  There is no support for the claim that Loera committed perjury; but even if Loera's affidavit had been attached to the motion, and assuming its truth, the fact that she lied when she testified that Ortegon used heroin did not affect the outcome of the trial.  There is little support for Ortegon's assertion that Estrada lied about his reasons for killing Alejandro -- he might have had more than one motive.  In any event, Ortegon fails to explain how he was prejudiced.

### III

For the foregoing reasons, the Appellants' convictions and sentences are

A F F I R M E D.